**UNITED STATES of America, Appellant,**

v.

**COMMONWEALTH OF VIRGINIA, Colonel Denny M. Slane, Appellees.**

**UNITED STATES of America, Appellee,**

v.

**COMMONWEALTH OF VIRGINIA, Colonel Denny M. Slane, Appellants.**

**UNITED STATES of America, Appellant,**

v.

**COMMONWEALTH OF VIRGINIA, Colonel Denny M. Slane, Appellees.**

Nos. 78–1764, 78–1765 and 78–1840.

United States Court of Appeals, Fourth Circuit.

Argued Dec. 3, 1979.

Decided April 17, 1980.

Vincent F. O'Rourke, Jr., Dept. of Justice, Washington, D. C. (Brian K. Landsberg, Walter W. Barnett, Irving Goldstein, Dept. of Justice; Drew S. Days, III, Asst. Atty. Gen., Washington, D. C., William B.

Cummings, U. S. Atty., Alexandria, Va., on brief), for the U. S.

James E. Moore and Leonard L. Hopkins, Jr., Asst. Attys. Gen., Richmond, Va. (Marshall Coleman, Atty. Gen. of Va., Richmond, Va., on brief), for Com. of Va. and Colonel Denny M. Slane.

Before HAYNSWORTH, Chief Judge, BUTZNER, Circuit Judge, and FIELD, Senior Circuit Judge.

FIELD, Senior Circuit Judge:

This case involves the application of Title VII of the Civil Rights Act of 1964, as amended,[1] and the anti-discrimination provisions of the Omnibus Crime Control and Safe Streets Act of 1978, as amended,[2] in a suit instituted by the United States against the Commonwealth of Virginia and the Superintendent of the Virginia State Police. The United States charges that the Commonwealth engaged in a "pattern and practice" of discrimination against black applicants for civilian positions with the state police and against both black and women applicants for trooper positions.

The basic employment requirements for state troopers in Virginia prior to March, 1976, included, *inter alia*, that an applicant (1) be between 21 and 29 years of age; (2) be at least 5′9″ and weigh at least 156 pounds; (3) be a graduate of an accredited high school (or the equivalent); (4) be a licensed driver with a good record; (5) undergo a thorough background investigation; and (6) pass three written mental ability tests. Applicants for civilian dispatcher positions also had to complete the written examinations. The requirements for other civilian positions varied, but all applicants were subject to a background investigation. Final employment decisions for all positions were made by the Superintendent of State Police.

The United States conducted a three-year investigation of these hiring practices which led to the filing of this suit in the Eastern District of Virginia. The investigation revealed that the Commonwealth hired no black troopers from its inception until 1969, and that from 1972 until 1976 only 3.3 percent of the new troopers employed were black. No black applicants were selected for any of the eighty-five dispatcher positions until 1977, and the blacks employed in the remaining civilian jobs were relegated to lower paying and less desirable positions. Women were also found to be under represented in the force with only three women applicants for trooper positions offered employment by the time of trial.

Upon pretrial motion by the Commonwealth, the district court dismissed the Title VII claims since this suit was instituted by the Attorney General rather than by the Equal Employment Opportunity Commission (EEOC) as required by federal statute. The case came to trial based solely on alleged violations of the Crime Control Act. The court found for the United States on allegations that the Commonwealth discriminated against women applicants for trooper positions[3] and against blacks for civilian dispatcher positions.[4] The court

---

1. Title 42 U.S.C. § 2000e–2 provides in part:
 (a) It shall be an unlawful employment practice for an employer—
 (1) to fail or refuse to hire or to discharge any individual * * * because of such individual's race, color, religion, sex or national origin.

2. Title 42 U.S.C. § 3766 provides in part:
 (c)(1) No person in any State shall on the ground of race, color, religion, national origin, or sex be excluded from participation in, be denied the benefits of, or be subjected to discrimination under or denied employment in connection with any program or activity funded in whole or in part with funds made available under this chapter.

The Virginia State Police is partially funded under the Crime Control Act.

3. The sex discrimination violation was based upon the State Police requirements that an applicant must be 5′9″ in height and weigh at least 156 pounds. The plaintiff's evidence demonstrated that these requirements would eliminate 98% of all women. The height and weight requirements were voluntarily dropped by the Commonwealth in July, 1976.

4. Black applicants for dispatcher positions were required to take the same written exam taken by applicants for trooper positions. The court found that the test had an "adverse impact" on blacks and was not a valid predictor

further found that prior to July 1, 1973, the Commonwealth discriminated against blacks for all other positions, but since the anti-discrimination provisions of the Crime Control Act did not take effect until that date, the district court ruled for the Commonwealth on the remaining charges.[5] The district court declined to apply the EEOC guidelines[6] applicable to the possible discriminatory nature of the written examinations. The court also rejected certain statistical evidence offered by the United States, and perceived no reason to impose mandatory quotas to remedy past discrimination.

Upon appeal, the United States challenges the district court's dismissal of the Title VII claims, its rejection of the statistical evidence and the failure to apply appropriate EEOC guidelines. The Government also appeals from the district court's refusal to impose quotas. The Commonwealth cross-appeals from the liability and remedial conclusions of the district court, including its ruling that the United States was not required to prove intentional discrimination to establish a *prima facie* case.

### Dismissal of the Title VII Claims

■ By pretrial order filed April 8, 1977, the district court dismissed the Title VII claim, relying upon 42 U.S.C. § 2000e–6(c)[7] to hold that the Attorney General was without authority to maintain a Title VII action since this power had been transferred to the EEOC. Subsequent to this dismissal order of the district court, however, on February 23, 1978, the President submitted to Congress "Reorganization Plan No. 1 of 1978," under which full and complete authority to initiate Title VII actions was transferred to the Attorney General. The Plan was approved by Congress and was made effective as of July 1, 1978. In *United States v. North Carolina*, 587 F.2d 625 (4 Cir. 1978), cert. denied, 442 U.S. 909, 99 S.Ct. 2820, 61 L.Ed.2d 274 (1979), we concluded that *Bradley v. School Board of City of Richmond*, 416 U.S. 696, 94 S.Ct. 2006, 40 L.Ed.2d 476 (1974), required that we recognize and apply the law with respect to this transfer of authority in a case which was pending on appeal on the effective date of the Plan. Accordingly, we must remand this case to the district court for further consideration in the light of Title VII.

### Title VII Standards Applicable to State Governments

■ Although the district court improperly dismissed the Title VII claim, it correctly employed Title VII standards in interpreting the anti-discrimination provisions of the Crime Control Act. H.R.Rep. No.94–1723, 94th Cong., 2d Sess., *reprinted in* [1976] U.S.Code Cong. & Admin.News, pp. 5374, 5418. The court held that under Title VII standards, the United States was not required to prove intentional discrimination to establish a *prima facie* case, but only that the employment practices of the defendants had an "adverse impact" on both black and women applicants for employment. This was based on *Griggs v. Duke Power Co.*, 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971), in which the Court determined that a *prima facie* case could be demonstrated by establishing that an employment practice had an "adverse impact" on black employees whether intended or

of job performance. This employment requirement is no longer used by the State Police in selecting dispatchers.

5. Much of the statistical data relied upon by the United States to demonstrate a *prima facie* case of discrimination against black applicants for trooper and civilian positions was discarded as inaccurate by the district court. The court also rejected the United States' evidence of intentional discrimination.

6. The EEOC issues professionally prepared guidelines to be used to determine whether employment tests are job related. These guidelines are the "administrative interpretation of the Act by the enforcing agency." *Griggs v. Duke Power Co.*, 401 U.S. 424, 433–434, 91 S.Ct. 849, 854–855, 28 L.Ed.2d 158 (1971).

7. Title 42 U.S.C. § 2000e–6 provides in part: Effective two years after March 24, 1972, the functions of the Attorney General under this section shall be transferred to the Commission * * * unless the President submits * * * a reorganization plan * * *.

not. If the plaintiff successfully proves that an employment practice has an "adverse impact," on minority applicants, the employer then has the "burden of showing that any given requirement * * * [has a] relationship to the employment in question." 401 U.S. at 432, 91 S.Ct. at 854. The Commonwealth contends that the "adverse impact" test applies only to private employers and that this is an improper test when Title VII standards are applied to state government employers. Relying upon *Washington v. Davis*, 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976), the defendants argue that intentional discrimination must be proven to establish a *prima facie* case against a state. *Davis* involved a suit which challenged employment practices of the police force of the District of Columbia, alleging racial discrimination in violation of the Due Process Clause of the Fifth Amendment. The written tests used by the police force eliminated a large portion of the black applicants for police positions. The Court held that the discriminatory impact of a policy alone was not enough to demonstrate a *prima facie* case under the Fifth Amendment, but that intentional discrimination must be shown. The Commonwealth contends that such a showing of intentional discrimination is required in the present case. *Davis*, however, does not support the Commonwealth's argument since the Court made it clear that in *Davis* its consideration was confined to Fifth Amendment principles and indicated that, unlike the Amendment, Title VII does not require proof of intentional discrimination.

Unquestionably, Congress was mindful of the *Griggs* "adverse impact" standard applicable to private employers when it amended Title VII in 1972 to include state and local governments as employers under the Act; and the legislative history clearly indicates that the standards to be applied to the Commonwealth under the 1972 amendments are the same Title VII standards which were earlier made applicable to private employers. *Dothard v. Rawlinson*, 433 U.S. 321, 331 n. 14, 97 S.Ct. 2720, 2728, 53 L.Ed.2d 786 (1977); see H.R.Rep.No.92–238, *reprinted in* [1972] U.S.Code Cong. & Admin.News, pp. 2137, 2152.

Although the Supreme Court has not directly addressed the application of the adverse impact standard to state governments, the Court has determined that Congress had authority under § 5 of the Fourteenth Amendment to "extend [Title VII] coverage to the states as employers." *Fitzpatrick v. Bitzer*, 427 U.S. 445, 453 n. 9, 96 S.Ct. 2666, 2670 n. 9, 49 L.Ed.2d 614 (1976). Section 5 grants Congress the power to "enforce [the equal protection clause of the Fourteenth Amendment] by appropriate legislation." *U.S.Const.* amend. XIV, § 5. The only question is whether the "adverse impact" standard mandated by Congress in the 1972 amendments to Title VII and applied by the district court below is appropriate legislation under § 5 of the Fourteenth Amendment.

In *Katzenbach v. Morgan*, 384 U.S. 641, 86 S.Ct. 1717, 16 L.Ed.2d 828 (1966), the Court stated that Congress was authorized to pass legislation, consistent with the Constitution, which was plainly adapted to the enforcement of the equal protection clause of the Fourteenth Amendment. Congress was granted discretion to determine "what legislation is needed to secure the guarantees of the Fourteenth Amendment." 384 U.S. at 651, 86 S.Ct. at 1724. Although this discretion is not unlimited, it is within congressional authority to extend the safeguards against discrimination to employees of state and local governments. *United States v. City of Chicago*, 573 F.2d 416, 423 (7 Cir. 1978). We agree with the Ninth Circuit that the 1972 amendments making the *Griggs* standard applicable to state employers "are rationally related to the goal [of prohibiting] discrimination" and "consistent with the letter and spirit of the Constitution." *Blake v. City of Los Angeles*, 595 F.2d 1367, 1373 (9 Cir. 1979). Accepting this constitutional premise, we are in accord with those courts who have held that Title VII applies the *Griggs* impact standard to both public and private employees. *See Scott v. City of Anniston*, 597 F.2d 897 (5 Cir. 1979); *Firefighters Institute, etc. v. City of St. Louis*,

549 F.2d 506 (8 Cir. 1977), *cert. denied* 434 U.S. 819, 98 S.Ct. 60, 54 L.Ed.2d 76 (1978); *United States v. State of South Carolina*, 445 F.Supp. 1094 (D.S.C.1977), *aff'd mem.* 434 U.S. 1026, 98 S.Ct. 756, 54 L.Ed.2d 775 (1978).

### Violations of the Crime Control Act

■ We agree with the district court that the United States presented sufficient evidence to demonstrate that the Commonwealth's employment practices had an adverse impact on black applicants for dispatcher positions. The district court found that the written examinations used by the state police to fill these positions had no valid correlation with job performance. Under *Griggs*, once the adverse impact was established, the burden passed to the Commonwealth to demonstrate that the test had a rational basis and was validated in terms of job performance. The Commonwealth did not attempt to show that the test was significantly related to job performance, but argues that since the number of black applicants affected was small, the United States has failed to demonstrate a pattern and practice of discrimination. The question, however, is not the number of applicants which were affected, but rather whether the United States established "by a preponderance of the evidence that racial discrimination was the [Commonwealth's] standard operating procedure—the regular rather than the unusual practice." *Teamsters v. United States*, 431 U.S. 324, 336, 97 S.Ct. 1843, 1855, 52 L.Ed.2d 396 (1977).

■ The district court also determined that the former height and weight requirements had an adverse impact on female applicants. The evidence presented by the Commonwealth did not demonstrate the need for these physical requirements, and without such justification, the court properly concluded that the height and weight standards were improper under *Griggs. Dothard v. Rawlinson, supra*, 433 U.S. 321, 97 S.Ct. at 2720, 53 L.Ed.2d 786.

■ The principal allegations of discrimination against black applicants for trooper positions were (1) that written tests used by the state police had an adverse impact on black applicants, and (2) that background investigations of applicants constituted intentional discrimination. The district court found that the written test had an adverse impact upon blacks and that it had not been shown to be a valid predictor of job performance. The court did, however, find, on the basis of the evidence presented, that the test, in fact, was a valid predictor of training school performance, and relying upon *Washington v. Davis, supra*, 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597, held that its use by the state police was not an unlawful or discriminatory employment practice. The court further found that the test was not a subterfuge for racial discrimination. In *Davis* the Court held that a positive relationship between the test and training-course performance was a sufficient validation under standards similar to those of Title VII. 426 U.S. at 250, 96 S.Ct. at 2052. While the evidence presented to the district court was sufficient to support its conclusion under *Davis*, upon remand the court should reconsider this issue in the light of the applicable EEOC guidelines to determine whether a contrary conclusion is required. Similarly, the district court should consider in the light of those guidelines the charge that the background investigations used by the Commonwealth served as a pretext for eliminating black applicants or whether there was "some legitimate, nondiscriminatory reason for the employee's rejection." *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973). *See EEOC v. United Virginia Bank/Seaboard National*, 615 F.2d 147 (4 Cir. 1980). In directing that these charges be further considered, we express no opinion with respect to the merits or ultimate disposition of them.

### Discrimination in Civilian Hiring

The United States also alleges that the Commonwealth violated the Crime Control Act by discriminating against black applicants for civilian positions with the state police. This allegation was based to some

degree upon statistical evidence that the proportion of blacks hired for such civilian positions was significantly less than the proportion of blacks in the available state work force as a whole. The district court rejected this statistical analysis since many of the civilian positions such as clerk-stenographer, computer programmer, and clerk-typist, require skills that may not be possessed or readily acquired by the general population. Accordingly, the court determined that the United States had failed to prove a *prima facie* case under *Hazelwood School District v. United States*, 433 U.S. 299, 97 S.Ct. 2736, 53 L.Ed.2d 768 (1977), in which the Court stated that "[w]hen special qualifications are required to fill particular jobs, comparisons to the general population (rather than to the smaller group of individuals who possess the necessary qualifications) may have little probative value." *Id.*, at 308 n. 13, 97 S.Ct. at 2742.

 In *Equal Employment Opportunity Commission v. Radiator Specialty*, 610 F.2d 178 (4 Cir. 1979), we had occasion to consider the practical implications of *Hazelwood*. Writing for the court, Judge Phillips recognized "the critical importance of establishing the existence or non-existence of special job qualifications when general population statistics are offered as the base data to prove a *prima facie* case based on gross racial disparities in employment," *Id.*, at 184, and identified three general classifications of job positions for the purposes of statistical proof in a Title VII case such as this. First are those in which it is manifest from the mere identification of the job positions in question that no special qualifications exist as a matter of law. In such cases, general population statistics are appropriate in assessing a plaintiff's *prima facie* proof. Second are those in which it is equally manifest that special qualifications do exist, and in such a case a plaintiff will ordinarily be required to produce specially qualified market statistics in an attempt to establish a *prima facie* case. Finally, are those cases in which it will not be manifest as a matter of law simply from the identification of the job position whether or not special qualifications are required, and in

such cases the burden rests upon the defendant to establish that the positions, in fact, do require special qualifications not possessed or readily acquired by the general population. If the defendant carries this initial burden, then the plaintiff should have the opportunity to present statistical proof to reflect a labor pool base possessing such special qualifications.

 Upon remand the parties and the court should address themselves to each civilian job classification in the State Police to determine which positions, if any, require special qualifications and, based upon this threshold determination, the appropriate statistical proof required under *Radiator Specialty*.

### CONCLUSION

As we have noted, on remand the district court should consider the charges of discrimination made by the United States in the light of Title VII, and incident thereto, we note that even though some Title VII standards were applied by the district court, it considered only those alleged violations which occurred on or after July 1, 1973, the effective date of the anti-discrimination provisions of the Crime Control Act. Since Title VII became applicable to state and local governments on March 24, 1972, the district court should consider possible violations which occurred during that sixteen month period. As we have noted, the United States should also be permitted to develop further the statistical data bearing upon the alleged discrimination against black applicants for civilian positions. We express no opinion in regard to any remedial steps since any remedy, of necessity, will depend upon the findings of the court on the several charges of discrimination.

*AFFIRMED IN PART; REVERSED IN PART; AND REMANDED.*