**Johnnie GILBERT, et al., Plaintiffs,**

v.

**CITY OF LITTLE ROCK, et al., Defendants.**

**Julius Bryant, et al., Intervenors.**

**No. LR-C-78-340.**

United States District Court, E. D. Arkansas, W. D.

Aug. 13, 1982.

Manuel L. Pruitt, Little Rock, Ark., and Roma J. Stewart, Washington, D. C., for plaintiffs.

Philip K. Lyon and Stephen W. Jones, House, Holmes & Jewell, and R. Jack Magruder, III, Asst. City Atty., Little Rock, Ark., for defendants.

Phillip J. Duncan, Little Rock, Ark., for intervenors.

## MEMORANDUM OPINION

ROY, District Judge.

On September 27, 1978, plaintiffs Johnnie Gilbert and Horace Walters filed charges with the Equal Employment Opportunity Commission [EEOC] alleging racial discrimination by the Little Rock Police Department [LRPD]. On September 27, 1978, plaintiffs Johnnie Gilbert, Horace Walters, Andrew Lockhart, and Billy O'Donald filed the original complaint in this action against the City of Little Rock, the Civil Service Commission [CSC], and Walter E. "Sonny" Simpson (in both his individual and official capacities). Relief was requested under 42 U.S.C. § 2000e–5(f), 42 U.S.C. § 1981, 42 U.S.C. § 1983, and the Fourteenth Amendment. On October 17, 1978, plaintiffs filed an amended complaint which dropped the CSC as a defendant. On February 16, 1979, Julius Bryant, Jack Matlock, Maxie Alexander, Grady Anthony, Marcella Wilson, and Finis Lowe filed charges with the EEOC alleging racial discrimination by the LRPD. On February 22, 1979, Julius Bryant, Jack Matlock, Maxie Alexander, Grady Anthony, Marcella Wilson, Finis Lowe, Jessie Briscoe and Larry Bazzelle filed a motion to intervene and a complaint. Their action was based upon 42 U.S.C. § 2000e–5(f), 42 U.S.C. § 1981, 42 U.S.C. § 1983, 42 U.S.C. § 1985, the Fourteenth Amendment, 31 U.S.C. § 1221, 31 U.S.C. § 1242, and 31 U.S.C. § 1244 of the State and Local Fiscal Assistance Act of 1972. The action was also brought under 42 U.S.C. § 3789d of the Omnibus Crime Control and Safe Streets Act of 1968. Injunctive relief and punitive and compensatory damages are sought by the plaintiffs and intervenors.

This case was tried to the Court for most of a 3-week period in January 1982. At the close of plaintiffs' case, a nonsuit was taken as to the individual case of intervenor Finis Lowe. At the conclusion of the trial the parties requested that the briefing schedule be delayed until the transcript was prepared. The last brief was filed on June 8, 1982, and the case is now ready for decision.

On February 4, 1982, a hearing was held on intervenor Sergeant Grady Anthony's request for a temporary injunction against the appointment of lieutenants from the eligibility list which was certified February 4, 1982. This Court denied the request for the reason that Sergeant Anthony had not shown the threat of irreparable injury or the other requirements necessary for the issuance of a preliminary injunction. *Dataphase Systems, Inc. v. C. L. Systems, Inc.,* 640 F.2d 109 (8th Cir. 1981).

In the case at bar, the plaintiffs and intervenors have alleged that the promotion system for the City of Little Rock impacts on the black employees in a disproportionate fashion, and that each of the individual plaintiffs and intervenors has been treated in a discriminatory fashion as to job assignments, discipline, and other matters. Another contention is that the number of black hires each year has an impact on the number of blacks available for promotion to supervisory positions in later years, so this issue will also be considered.

Carlton McMullin (white) was City Manager from October 31, 1973, until approximately July 11, 1980. Mahlon Martin (black) has served as City Manager from July 21, 1980, to the present. Walter E. "Sonny" Simpson has served as Police Chief since July 9, 1977. Gale Weeks served as Police Chief from September 1, 1969, to April 20, 1977.

The members of the City Board of Directors at the time of the trial were Gale Weeks (white), John Langston (white), Webb Hubbell (white), Myra Jones (white), Sandy Keith (white), Lottie Shackleford (black) and Mayor Charles Bussey (black). The Board of Directors, who are elected at large by the qualified voters of Little Rock, appoint the City Manager. The method of electing directors was upheld in the case of *Leadership Roundtable, et al. v. City of*

*Little Rock, et al.,* 499 F.Supp. 579 (E.D. Ark.1980), *aff'd per curiam,* 661 F.2d 701 (8th Cir. 1981), against a challenge based on racial discrimination.

The Civil Service Commission [CSC] of the City of Little Rock, a body of five members, is responsible for certain matters relating to the Little Rock Police and Fire Departments. Arkansas law governs the jurisdiction and procedures of the CSC. Pursuant to statutory authority, the CSC has promulgated rules and regulations governing the administration and enforcement of its activities. The CSC is charged by state law with promulgating lists of candidates for promotions in civil service positions, and the certifying of candidates in numerical order from which the candidates are selected in exact rank order (*Ark.Stat. Ann.* § 19–1603). The CSC has promulgated guidelines for promotional procedures in the Police Department. The rules and regulations of the CSC contain the following statement:

> "Discrimination based on race, religion, creed, sex or age is expressly forbidden. Any job candidate and/or employee may request and the Civil Service Commission will hear all appeals in violation of this section. Appeals on charges of discrimination shall be made to the Civil Service Commission, after administrative processes with management have been exhausted."

The CSC has jurisdiction over appeals from disciplinary actions in the Police Department.

The following people have served on the CSC during the time between January 1, 1975, and the present:

Roy Beard (white), April 1965 through April 1977;

Dr. Jerry Jewell (black), April 1969 through April 1975;

Peyton Rice (white), April 1969 through April 1975;

Fred Hook (white), November 1971 through September 1978;

Charles Crawford (black), April 1972 through April 1977;

Dale Booth (white), November 1973 through present;

Steve Baker (white), April 1975 through April 1981;

Perlesta Hollingsworth (black), April 1977 through July 1979;

Maryann Eastin (white), April 1977 through present;

Lynn Davis (white), September 1978 through present;

Darrell Brown (black), July 1979 through present;

Sam Tatum (white), April 1981 through present.

*Ark.Stat.Ann.* § 19–1603 requires the Civil Service Commissioners to prescribe and enforce regulations for Fire and Police Departments. Such rules and regulations have the force of law. This statute requires open, competitive examinations to be used to assess the qualifications of each applicant. An eligibility list must be maintained in order of standing on examination and automatically expires after one year. The department head must select the highest name on the list for promotion. Advertising of examinations is required. *Ark. Stat.Ann.* § 19–1307 requires that all examinations must be fair and impartial and must test the qualifications of applicants for the particular service and positions to be filled. *Ark.Stat.Ann.* § 19–1603 provides that no person shall be eligible for appointment to any position in the Police Department who has not arrived at the age of 21 years or who is over the age of 45 years. *Ark.Stat.Ann.* § 42–1005(e) (1979) empowered the executive commission on law enforcement standards to establish minimum selection and training standards for employment of all law enforcement officers. In accordance therewith, a Rules and Regulations Manual (Joint Exhibit 10) has been promulgated which provides in Section 1002 that an applicant for a position with a police department must not have been convicted by a state or by the federal government of a crime, the punishment for which could have been imprisonment in a federal

penitentiary or a state prison.[1] It also provides that an applicant for such a position must be a high school graduate or have passed the General Education Development [GED] test indicating high school graduation level. It provides that the governing body of any county, city or town may waive the high school graduate requirement or the GED test equivalency requirement at its discretion. The City of Little Rock has not waived this requirement. The educational and age requirements were supported by testimony in the record. Section 1002 of the regulations also sets forth other minimum selection requirements. Act 45 of 1981 transferred all powers and functions of the executive commission to the newly formed Arkansas Commission on Law Enforcement Standards and Training.

Walter E. "Sonny" Simpson is Chief of Police in the LRPD. Serving under him at the time of trial were two assistant chiefs, Clarence Hunter (black) and Jesse Hale (white). The department is divided into 7 divisions which are as follows: Administration, Community Relations and Training, Detention, Investigation and Apprehension, Patrol and Auxiliary, Records and Support, and Organized Crime and Intelligence. Five captains report to the assistant chiefs and are directly responsible for the command of the divisions.

The job classifications of the uniformed personnel in the Police Department, beginning with the entry level category, are as follows: Police Officer, Sergeant, Lieutenant, Captain, Assistant Chief and Chief. The Personnel Department has created job descriptions for each rank which list the duties and requirements for each job. Police officers with 5 years of active service are eligible to apply for promotion to sergeant. (This minimum service requirement was raised from 3 to 5 years by the CSC on February 26, 1981.) Sergeants with 1 year active service in that job classification are eligible to apply for lieutenant. Lieutenants with 1 year active service in that job classification are eligible to apply for promotion to captain. Permanent lieutenants (those who have completed a probationary period) and captains are eligible to apply for promotion to assistant chief and chief.

Police officers serve a period of probation of 12 months before appointment is complete and 6 months before any promotion is complete.

The LRPD uses a book of rules and regulations and a policy manual by which the officers are to abide. The causes for reprimand, suspension or removal include but are not limited to the following: incompetence and neglect of duty, negligent or willful damage to public property or waste of public supplies, absence without leave and excessive absenteeism. Any employee suspended, dismissed or demoted from the LRPD may, by his written request to the CSC, have the action reviewed. Said request must be made within 10 days after notification by the department head requesting a hearing. The CSC shall grant an administrative hearing at which the employee may introduce evidence and be represented by a person of his choosing. The decision is by majority vote of the members of the CSC. The decision of the CSC may be appealed to the circuit court and higher.

A Little Rock city ordinance supporting equal opportunity and affirmative action was adopted by the Board of Directors in 1971. The City of Little Rock adopted its first affirmative action plan in 1973 which was limited to the Police Department. In 1974 the plan was extended to cover all city departments. Other affirmative action plans were adopted in 1975, 1979, and 1981.[2]

In a Title VII action the relevant time period begins 180 days prior to the filing of a charge with the EEOC, 42 U.S.C. § 2000e–5(e). All allegedly discriminatory actions which occurred prior to that cutoff date are treated as if they had never been

---

1. No question was raised concerning the requirement that an applicant for a position with the LRPD must be free of felony convictions, and the Court finds this is a reasonable and job-related requirement.

2. The basis for most of the background information outlined above is found in Joint Exhibits 35, 3, 4, and 5.

the basis for a charge. Although such actions may be relevant background information, they have no present legal consequences. Even a practice which gives present effect to past discrimination is not unlawful under Title VII. *United Air Lines v. Evans*, 431 U.S. 553, 97 S.Ct. 1885, 52 L.Ed.2d 571 (1977). In the instant case the first EEOC charges were not filed until September 27, 1978; therefore, the relevant time period for purposes of Title VII began on March 27, 1978. All acts which occurred prior to that date are legal under Title VII. All promotion lists certified prior to that date are legal, and not relevant to the disparate impact issues.

The statute of limitations for a 42 U.S.C. § 1981 action in Arkansas is *Ark.Stat.Ann.* § 37–206 (3 years). *Johnson v. Railway Express Agency, Inc.*, 421 U.S. 454, 95 S.Ct. 1716, 44 L.Ed.2d 295 (1975); *Martin v. Georgia-Pacific Corp.*, 568 F.2d 58 (8th Cir. 1977). *Ark.Stat.Ann.* § 37–206 is also the statute of limitations for § 1983 actions. *Clark v. Mann*, 562 F.2d 1104 (8th Cir. 1977). Therefore, all allegedly discriminatory acts which occurred prior to September 27, 1975, are not remediable under § 1981 and § 1983.

This is not a class action. Plaintiffs never included in their complaint any request for relief on behalf of a class nor did they move for class certification in accordance with the provisions of Rule 23 of the Federal Rules of Civil Procedure or Local Rule 24(3). However, at the end of the trial plaintiffs moved for certification of a class and the Court after careful consideration of the record denied the motion for lack of merit.

The plaintiffs have no standing to press any claims of discriminatory discharge for none of the plaintiffs have been fired by the LRPD. Since all of the plaintiffs were hired, new hire statistics are only relevant as background information.

Any issues affecting Clarence Hunter are now moot. He has not filed an EEOC charge nor has he filed suit against the LRPD. The facts did not warrant certifying a class in order to bring Hunter in

as a party. Hunter has recently retired and is no longer employed at the LRPD. Any alleged discrepancy in his salary with Assistant Chief Hale was fully explained by the fact that Hale had been an assistant chief for 2 years longer than Hunter. There is no evidence whatever to support plaintiffs' assertions that Hunter's position was merely a "token" position.

Although trial of this cause centered around Title VII, other causes of action were alleged in the complaints and must be discussed.

■ An action brought under § 1981 is subject to the same allocation of the burden of proof as is present in Title VII disparate treatment cases. *Kenyatta v. Bookey Packing Co.*, 649 F.2d 552 (8th Cir. 1981); *Paxton v. Union National Bank*, 519 F.Supp. 136 (E.D.Ark.1981) (also citing *Kenyatta*). The plaintiff must prove intent to discriminate on the part of the defendant. *Washington v. Davis*, 426 U.S. 229, 239, 96 S.Ct. 2040, 2047, 48 L.Ed.2d 597 (1976); *Marshall v. Kirkland*, 602 F.2d 1282, 1283 (8th Cir. 1979) (§ 1981 and § 1983). Back pay under § 1981 is not restricted to the 2-year limit which 42 U.S.C. § 2000e–5(g) imposes on Title VII actions, but is limited only by Arkansas' 3-year statute of limitations. *Johnson v. Railway Express Agency, Inc., supra.* Pursuit of EEOC procedures required by Title VII does not toll the statute of limitations for § 1981 actions based on the same transactions. *Id.*, 421 U.S. at 465–66, 95 S.Ct. at 1722–23; *Greene v. Carter Carburetor Co.*, 532 F.2d 125 (8th Cir. 1976).

The plaintiff in a § 1983 action must also prove discriminatory intent on the part of the defendant. *Thompson v. School District of Omaha*, 623 F.2d 46, 48 (8th Cir. 1980); *Marshall v. Kirkland, supra*, at 1288; *Clark v. Mann, supra*, at 1112.

■ Municipalities and local governmental units are "persons acting under the color of law" within the meaning of § 1983. *Monell v. New York City Dept. of Social Services*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). Exhaustion of administrative remedies is not a prerequisite to suit under

§ 1983. *Simpson v. Weeks*, 570 F.2d 240 (8th Cir. 1978), *cert. denied*, 443 U.S. 911, 99 S.Ct. 3101, 61 L.Ed.2d 876 (1979).

In *City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 101 S.Ct. 2748, 69 L.Ed.2d 616 (1981), the United States Supreme Court held that municipalities are immune from punitive damages under § 1983. The Court was persuaded that the purpose of deterrence would not be accomplished by the allowance of punitive damages against municipalities. *Id.*

Actions under § 1985 involve the typical elements of constitutional discrimination claims (*e.g.*, § 1981 or § 1983 claims), plus the additional element of a conspiracy on the part of the defendants to deprive the plaintiff of equal protection or privileges and immunities under the laws. A class-based, invidiously discriminatory intent is an essential element of a *prima facie* case under § 1985. *McNally v. Pulitzer Publishing Co.*, 532 F.2d 69, 74 (8th Cir. 1976).

In *Griffin v. Breckenridge*, 403 U.S. 88, 91 S.Ct. 1790, 29 L.Ed.2d 338 (1971), the United States Supreme Court stated at 102, 91 S.Ct. at 1798:

"The language requiring intent to deprive of *equal* protection, or *equal* privileges and immunities, means that there must be some racial or perhaps otherwise class-based, invidiously discriminatory animus behind the conspirators' action."

To prevent circumvention of EEOC conciliation procedures, the United States Supreme Court has held that deprivation of a right created by Title VII cannot be the basis of an action under § 1985. *Great American Federal Savings and Loan Assn. v. Novotny*, 442 U.S. 366, 99 S.Ct. 2345, 60 L.Ed.2d 957 (1979).

The inclusion of a Fourteenth Amendment claim in the present case is redundant because the § 1981 and § 1983 causes of action are based on the Fourteenth Amendment. *Washington v. Davis, supra.* The requirement of a showing of discriminatory intent is constitutional and applicable to Fourteenth Amendment claims. *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977).

Discrimination claims brought under the revenue sharing statute are governed by Title VII standards and may include disparate treatment and/or disparate impact claims. *United States v. City of Miami*, 614 F.2d 1322, 1328–29, *rehearing granted*, 625 F.2d 1310 (5th Cir. 1980); *United States v. City of Chicago*, 549 F.2d 415 (7th Cir.), *cert. denied*, 434 U.S. 875, 98 S.Ct. 225, 54 L.Ed.2d 155 (1977).

31 U.S.C. § 1244 specifically provides for a private right of action in "an appropriate United States District Court or in a State Court of general jurisdiction." The plaintiff must first file an administrative complaint with the Secretary of the Treasury or with an agency with which the Secretary has an agreement to investigate noncompliance under the Act. Ninety days after the administrative complaint is filed, administrative remedies are deemed to be exhausted and the plaintiff may institute a civil action. Relief available is "any temporary restraining order, preliminary or permanent injunction or other order, including the suspension, termination, or repayment of funds, or placing any further payments under this chapter in escrow pending the outcome of the litigation." Discretionary attorney's fees and costs are authorized. No provision is made for award of monetary damages to plaintiffs.

Actions brought under the Crime Control Act are subject to the same standards applied to Title VII actions, including disparate impact claims. *United States v. Commonwealth of Virginia*, 620 F.2d 1018, 1022 (4th Cir.), *cert. denied*, 449 U.S. 1021, 101 S.Ct. 589, 66 L.Ed.2d 483 (1980); *United States v. City of Miami, supra*, at 1328–29; *Brown v. New Haven Civil Service Bd.*, 474 F.Supp. 1256, 1264 (D.Conn.1979).

42 U.S.C.S. 3789d(c)(4)(A) explicitly provides for a private right of action by a "person aggrieved in an appropriate United States district court or in a State court of general jurisdiction." The plaintiff must first file an administrative complaint with the Law Enforcement Assistance Adminis-

tration or "any other administrative enforcement agency." Sixty days after the administrative complaint is filed, or upon the determination of the merits of the complaint by the Administration or agency, whichever is earlier, administrative remedies are deemed to be exhausted and the plaintiff may institute a civil action. Other than a provision for attorney's fees for a prevailing plaintiff, the Act does not spell out the remedies available to a private plaintiff but implies that injunctive relief is appropriate. There is no provision for monetary damages.

Actions brought under Title VII may seek to remedy either disparate treatment or the results of a disparate impact upon a protected group.

As indicated in the recent 8th Circuit case of *Coble, et al. v. Hot Springs School District No. 6, et al.*, 682 F.2d 721 (8th Cir. 1982), acts of intentional discrimination for which race was a motivating factor must be proven under the test set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). The court held in *McDonnell Douglas* that, first, the plaintiff has the burden of proving by the preponderance of the evidence a *prima facie* case of discrimination. Second, if the plaintiff succeeds in proving the *prima facie* case, the burden shifts to the defendant "to articulate some legitimate, nondiscriminatory reason for the employee's rejection" (at 802, 93 S.Ct. at 1824). Third, should the defendant carry this burden, the plaintiff must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination.

The complainant in *McDonnell Douglas* established a *prima facie* case by showing (1) that he belonged to a racial minority; (2) that he applied for and was qualified for a job for which the employer was seeking applicants; (3) that, despite his qualifications, he was rejected; and (4) that, after his rejection, the position remained open and the employer continued to seek applicants from persons of complainant's qualifications.

The United States Supreme Court explained this theory in *Teamsters v. United States*, 431 U.S. 324, 358, 97 S.Ct. 1843, 1866, 52 L.Ed.2d 396 (1977):

> "The importance of *McDonnell Douglas* lies, not in its specification of the discrete elements of proof there required, but in its recognition of the general principle that any Title VII plaintiff must carry the initial burden of offering evidence adequate to create an inference that an employment decision was based on a discriminatory criterion illegal under the Act."

In *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981), the United States Supreme Court clarified the employer's burden to "articulat[e] a legitimate, nondiscriminatory reason" for a challenged action:

> " * * * The defendant need not persuade the court that it was actually motivated by the proffered reasons. It is sufficient if the defendant's evidence raises a genuine issue of fact as to whether it discriminated against the plaintiff. To accomplish this, the defendant must clearly set forth, through the introduction of admissible evidence, the reasons for the plaintiff's rejection. *The explanation provided must be legally sufficient to justify a judgment for the defendant.*[3] [Footnote added] [Emphasis added]
>
> *       *       *       *       *       *
>
> "The plaintiff retains the burden of persuasion. She now must have the opportunity to demonstrate that the proffered reason was not the true reason for the employment decision. This burden now merges with the ultimate burden of persuading the court that she has been the victim of intentional discrimination. She may succeed in this either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the

---

**3.** This quote from *Burdine* was cited with approval in *Coble, supra.*

employer's proffered explanation is unworthy of credence."

At 254, 255, 101 S.Ct. at 1094, 1095 (citations omitted).

The current prevailing standard for the employer's burden in responding to a *prima facie* disparate treatment case is that the employer must present admissible evidence "legally sufficient to justify a judgment for the defendant."

Thereafter, the employee has the burden of proving by a preponderance of the evidence that the proffered reason is merely a pretext for discrimination. The plaintiff must prove that race was a "motivating factor" for the action. *Clark v. Mann, supra.*

The Eighth Circuit Court of Appeals addressed the matter in *Johnson v. Bunny Bread Co.*, 646 F.2d 1250, 1254 (8th Cir. 1981), in which case discriminatory discharges, job assignments and harassment were alleged and the court stated: "Clearly an employer bears no burden of persuading by a preponderance of the evidence that it was actually motivated by its proffered reason."

A number of plaintiffs' witnesses testified about discrimination in the administration of discipline, awarding of transfers, and harassment of black officers by whites. The discipline and transfer claims will be discussed *infra* in the plaintiffs' individual cases. However, the allegations of racial harassment will be dealt with at this point.

Many incidents which happened prior to September 1975 have historical significance and serve as background information against which evidence in this case is viewed. The importance of such evidence has been weighed and considered by the Court. The City stipulated that it engaged in racial discrimination before the effective date of Title VII (1972). However, this admission is to be considered only to the extent legally permissible, and should not eclipse the efforts in recent years of the Department to end racial harassment.

The Court also notes that some of the officers about whose actions plaintiffs have complained in the past are no longer employed by the LRPD, namely, Sergeant Pridgen, Sergeant Baer, Lieutenant Anderson, Sergeant Bill Bates, and Jim Harris. Their absence indicates an improved racial atmosphere at the LRPD.

During the relevant time frame, the evidence is insufficient to establish a pattern of racial harassment at the LRPD. The plaintiffs have not shown that racial harassment is the "standard operating procedure" at the Department. In fact, most allegations are isolated events that cannot in and of themselves support a finding that a racially-biased atmosphere has permeated the LRPD since September 1975. Reprimands were issued to those involved in racial incidents and action taken to promptly correct the situation when the information came to the attention of the officers in charge.

The Eighth Circuit Court of Appeals in *Johnson v. Bunny Bread Co., supra,* stated: "After a painstaking review of the transcript, we conclude that as a matter of law the racial slurs, if any, used at Bunny Bread did not violate Title VII. We find no steady barrage of opprobrious racial comment. The use, if any, of racial terms was infrequent, was limited to casual conversation among employees, and with possible rare exceptions was not directed toward appellants. '[M]ore than a few isolated incidents of harassment must have occurred. Racial comments that are merely part of casual conversation, are accidental, or are sporadic do not trigger Title VII's sanctions.' *EEOC v. Murphy Motor Freight Lines, Inc.*, 488 F.Supp. 381, 384, 22 FEP Cases 892 (D.Minn.1980) (citations omitted). See *Cariddi v. Kansas City Chiefs Football Club, Inc.*, 568 F.2d 87, 88, 16 FEP Cases 462 (8th Cir. 1977). Such racial slurs as were present at Bunny Bread were largely the result of individual attitudes and relationships which, while certainly not to be condoned, simply do not amount to violations of Title VII."

It was held in *Spearmon v. Southwestern Bell Telephone Co.*, 505 F.Supp. 761 (E.D.

Mo.1980), *aff'd*, 662 F.2d 509 (1981), that a supervisor's isolated act of racial harassment did not show a consistent plan or scheme by the defendant to harass the plaintiff.

In *Pouncy v. Prudential Insurance Co.*, 499 F.Supp. 427, 438 (S.D.Tex.1980), *aff'd*, 668 F.2d 795 (5th Cir. 1982), the court stated that the plaintiff must prove more than the mere occurrence of isolated "accidental" or sporadic discriminatory acts. Rather, he must establish by a preponderance of the evidence that racial discrimination was the defendant's "standard operating procedure—the regular rather than the unusual practice." Citing *Teamsters v. United States, supra*, 431 U.S. at 336, 97 S.Ct. at 1855. See, also, *Croker v. Boeing Co.*, 662 F.2d 975 (3d Cir. 1981); *Mosley v. General Motors Corp.*, 497 F.Supp. 583 (E.D.Mo. 1980).

In the case of *DeGrace v. Rumsfeld*, 614 F.2d 796 (1st Cir. 1980), the court stated:

"It may not always be within an employer's power to guarantee an environment free from all bigotry. He cannot change the personal beliefs of his employees; he can let it be known, however, that racial harassment will not be tolerated, and he can take all reasonable measures to enforce this policy."

Where an employer had a policy against racial harassment and disciplined white supervisors that it knew had engaged in harassment, the isolated acts of harassment by supervisors were held insufficient to establish a pattern and practice of racial discrimination in *Croker v. Boeing Co., supra*.

The LRPD proved that its practices come within the framework of the principles enunciated in *Croker* and *DeGrace, supra*, and violations of Title VII did not occur. Chief Simpson has taken affirmative action seriously at the LRPD and worked diligently to develop a good program. The Department has sponsored English classes for officers through the University of Arkansas at Little Rock, the classes being held on the LRPD premises. Classes in criminal evidence and criminal justice have also been offered. Julius Bryant and Jessie Briscoe are among those who have taken advantage of the courses, although Jessie Briscoe subsequently dropped out. The City of Little Rock pays the tuition for these classes.

In early 1978, Chief Simpson first met with the members of the Black Police Officers Association [BPOA]. Several of the plaintiffs were present at this meeting. He discussed the most recent sergeant's examination with them and pointed out that few blacks had taken and passed the examination, and that no one could help them unless they took and passed the examinations. He never promised them promotions if they did pass. However, the Chief discussed ways in which the blacks could prepare for the written and oral examinations and improve their chances of promotion.

About two months later, Chief Simpson met with members of BPOA again and they discussed progress in their preparations for the tests.

The Chief's third meeting with the BPOA members was held about six weeks before the 1978 sergeant's examination. At the conclusion of the meeting Johnnie Gilbert read a resolution that the BPOA had drafted to the effect that if the Chief did not guarantee that two blacks would be promoted to sergeant, they would sue him.

When the members of BPOA threatened the Chief with a lawsuit, before the test had even been given, they disregarded the fact that as part of the City's efforts to make the tests as objective as possible, the Chief had relinquished his "Chief's points" and that he personally had no power whatever to influence promotions. However, he did assist them all he could in preparation.

A major focus of the LRPD's affirmative action effort is in the recruitment of minorities and women for the position of police officer. Recruiting trips have been made to Pine Bluff, Helena, Forrest City, and Little Rock where representatives of the Training Division and Personnel Department attempted to recruit minorities and women. These efforts included, *inter alia*, the placement of advertisements on the radio and the taking of applications.

Grady Anthony attempted to recruit blacks at Chief Simpson's direction in 1978, and he was instructed to put forth every effort to recruit minorities. Sergeant Anthony made trips to Philander Smith College and the University of Arkansas at Pine Bluff in May 1978. Anthony's monthly report filed June 27, 1978, clearly demonstrates the difficulty in getting applicants to participate in the entrance examination process. Other reports reflect Anthony's continued efforts and also continued problems.

Chief Simpson initiated the "Cadet Program" because he thought that recruitment strength would lie in recruiting young people. Lieutenant Daley and his personnel attended career days, job fairs, colleges, high schools and the Urban League meetings to attract minority cadet applicants. Much of Sergeant Anthony's recruitment efforts were also aimed at cadets.

A number of the black cadets went on to become police officers. Julius Bryant and Finis Lowe are two examples. Defendants' Exhibit No. 12 demonstrates the success of the cadet program in recruiting blacks. Page 1 of Defendants' Exhibit 12 sets forth, by race, the number of cadets hired by the LRPD from January 1, 1974, through August 14, 1981. Page 2 of Defendants' Exhibit 12 shows the number of whites and blacks who were hired as cadets and later went on to become police officers. The reason for the small numbers in very recent years is that cadets cannot become police officers until their 21st birthday. Cadets also now receive primary consideration for police officer vacancies. Since January 6, 1980, six blacks have been promoted from cadet to police officer. Defendants' Exhibit 16 also demonstrates that in spite of the recent financial crunch, there were twenty-two blacks at the LRPD on January 8, 1982.

Mahlon Martin is presently the City Manager and is the Chief Executive Officer of the City. In the position of City Manager, Martin has direct control over the Chief of Police. Martin, who is black, has been involved in the City's affirmative action efforts since 1969 (except for a brief period between November 1979 and July 1980). As a matter of fact, he went to work in 1969 as a minority recruiter for the police and fire departments. He testified that in his opinion the system has not worked perfectly but that tremendous progress was made in affirmative action and that the promotional system did not discriminate on a racial basis. (T. 508–49) In light of Mr. Martin's background and experience, his opinion is entitled to a great deal of weight.

The LRPD uses what is known as "progressive discipline." For minor infractions of the departmental rules and regulations, the discipline for a first violation is usually an oral counseling session by the officer's supervisor. For the second such offense, a written reprimand, which is placed in the officer's personnel file, is in order. Progressively more severe discipline in the form of 1 to 30 days' suspension may follow for repeated violations. Officers have the right to submit a rebuttal to a written reprimand, which is also placed in his or her personnel file. When an officer is suspended, he must be notified in writing and he is given a right to appeal the action first to the CSC and later to the circuit court.

Officers, both white and black, are often "counseled" by their supervisors. These counseling sessions are for the officer's own good, to improve his or her job performance, and to let the officer know what areas need to be improved. Some take the criticism well; others do not. Counseling by the supervisors at the LRPD is a necessary part of the individual's growth as a police officer and it is vital to the effective administration of the Department. The Court finds blacks were not discriminated against individually or as a group by the counseling sessions.

The evidence shows that both blacks and whites have received similar disciplines for similar infractions. Some plaintiffs testified that they had been discriminated against in regard to discipline, but the defendants presented convincing testimony that discipline had been fairly administered. From the records, defendants' expert witness, Dr. Robert F. Baker, analyzed the

discipline system and found it to be fairly administered.

Disparate impact may occur if a facially neutral employment practice, applied evenly to whites and blacks, bars a disparate number of blacks for consideration for promotion.

■ Though it is necessary to prove intentional discrimination under a claim of disparate treatment, it is not required when pressing a disparate impact claim. *Teamsters v. United States*, 431 U.S. 324, 336, n. 15, 97 S.Ct. 1843, 1855, n. 15, 52 L.Ed.2d 396 (1976). In *Griggs v. Duke Power Co.*, 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971), the United States Supreme Court recognized that the thrust of the 1964 Civil Rights Act was directed to the consequences of employment practices in addition to or even apart from the motivation of the employer. Every individual employee is protected against practices that are fair in form but discriminatory in operation. *Connecticut, et al. v. Winnie Teal, et al.*, —— U.S. ——, 102 S.Ct. 2525, 73 L.Ed.2d 130 (1982).[4]

In *Teal* the court made the following statement:

"* * * The statute speaks, not in terms of jobs and promotions, but in terms of *limitations* and *classifications* that would deprive any individual of employment *opportunities*. A disparate impact claim reflects the language of § 703(a)(2) and Congress' basic objectives in enacting that statute: 'to achieve equality of employment *opportunities* and remove barriers that have operated in the past to favor an identifiable group of white employees over other employees.' 401 U.S., at 429–430 [91 S.Ct. at 852–53] (emphasis added). When an employer uses a non-job-related barrier in order to deny a minority or woman applicant employment or promotion, and that barrier has a significant adverse effect on minorities or women, then the applicant has been deprived of an employment *opportunity* 'because of . . . race, color, religion, sex, or national origin.' In other words, § 703(a)(2) prohibits discriminatory 'artificial, arbitrary, and unnecessary barriers to employment,' 401 U.S., at 431 [91 S.Ct. at 853] that 'limit . . . or classify . . . applicants for employment . . . in any way which would deprive or tend to deprive any individual of employment *opportunities*.' (emphasis added.)"

■ If disparate impact is established, the burden shifts to the employer to show that the practice has a "manifest relationship to the employment in question"; the "touchstone is business necessity." *Griggs v. Duke Power Co., supra*, 401 U.S. at 431–32, 91 S.Ct. at 853–54; *McCosh v. City of Grand Forks*, 628 F.2d 1058, 1062 (8th Cir. 1980); *Kirby v. Colony Furniture Co.*, 613 F.2d 696, 703 (8th Cir. 1980).

Even in disparate impact cases, the plaintiff must prove that he is qualified for the job in question. *Ramirez v. Hofheinz*, 619 F.2d 442 (5th Cir. 1980).

■ An employer may rebut a *prima facie* case of disparate impact by showing that a selection device (such as the promotional processes at issue herein) is valid under the Uniform Guidelines on Employee Selection Procedures, 29 C.F.R. § 1607.5 (1979). As discussed *infra*, the LRPD did in fact demonstrate that its promotional processes and all the subparts for sergeant and lieutenant are valid under the Uniform Guidelines, rebutting any showing of disparate impact.

Dr. Lee Hoffman, plaintiffs' witness, was qualified by the Court as an expert statistician, specializing in the area of employment discrimination with a Ph.D. degree from Princeton. He also had several other degrees and considerable experience in his field.

Dr. Hoffman performed multiple analyses of the material and data, the bulk of which covered the years 1975 through 1979, concerning the promotional system of the

4. Four U. S. Supreme Court Justices joined in a vigorous dissent to the opinion written in this case stating: "Today's decision takes a long and unhappy step in the direction of confusion." Only time can tell the full impact of the decision.

LRPD. He reviewed the material contained in all the joint exhibits and his analysis of this information was received as Plaintiffs' Exhibit 1. This exhibit contained charts and statistical data in support of plaintiffs' allegations.

Dr. Hoffman testified *inter alia* that the affirmative action program for the LRPD was a failure; that there were violations of the Four-Fifths Rule in promotions and hiring ratios. He testified that a violation of the Four-Fifths Rule is not inconsistent with a failure to find statistically significant differences using the Chi Square Test because the Chi Square Test is not sensitive enough to reveal a statistically significant difference in outcome for samples of this size. Further, he testified that adverse impact is revealed in the promotion rate when compared with blacks versus whites under the "bottom line" concept as to whether or not an individual is promoted or fails to be promoted.

Plaintiffs' witness, Dr. James Lawrence Outtz, was qualified by the Court as an expert in industrial psychology. Dr. Outtz received his Bachelor of Arts degree in sociology from Northeast Louisiana University; he received a Master of Science degree in industrial psychology from Northeast Louisiana University; and he received a Ph.D. degree in industrial psychology from the University of Maryland in 1976.

Dr. Outtz examined documents which described the components of the promotional process in the LRPD for the years 1975 through 1980. He testified that there was no demonstration by the City of Little Rock that the person who did well on the oral interview performed better on the job than someone who did not perform well on the oral interview; or that the use of seniority was justifiable procedure as a component part of the examination process. Furthermore, he criticized the use of "Chief's points" in the rating system.

It was also Dr. Outtz's opinion that a proper job analysis was not performed in the LRPD examination and promotion procedure.

Other witnesses, including three black attorneys, testified that the promotion procedure at the LRPD was unfair to blacks.

The Court finds on the record as a whole that the plaintiffs have made a *prima facie* case on the issue of disparate impact. However, defendants in their rebuttal presentation have proved that many of plaintiffs' statistics omitted relevant factors. Plaintiffs' statistics have been reworked, adding pertinent factors, and defendants' proof undermines plaintiffs' claims as discussed *infra*.

Dr. Robert Baker graduated from the University of Arkansas at Little Rock in 1966 with a Bachelor of Science degree in economics and he later received a Ph.D. degree from the University of Alabama. He has worked extensively in many areas relating to the analysis of employment practices. His credentials were impressive and Dr. Baker was recognized by the Court as an expert statistician and labor economist.

Dr. Baker conducted an extensive review of material submitted to him for analysis. Among other issues, he analyzed hiring patterns, promotion issues, work force snapshots, and disciplinary issues. In conducting the promotion analysis, he attempted to discern any evidence of adverse impact on the several component parts of the sergeant tests for two separate testing dates. Moreover, he provided a detailed analysis of Plaintiffs' Exhibit 1.

Dr. Baker's analyses were reflected in Defendants' Exhibits 7A–1 through 7A–14 in their case in chief; Exhibits 7B–1 through 7B–29 were introduced in rebuttal to Plaintiffs' Exhibit 1.

Defendants' Exhibit 7A–1 demonstrates that the relevant labor market of blacks in the Little Rock-North Little Rock Standard Metropolitan Statistical Area [SMSA], based upon 1970 census data, is 10.6%. This percentage represents blacks in the age category 20–44 with at least a high school education.

Defendants' Exhibits 7A–2 and 7A–3 provide a basis for the inference that the 10.6%

figure used for the relevant labor market is a conservative one in that the 1970 census does not reflect those individuals residing in the SMSA who have been convicted of felonies. Were such information available, it would reduce the representation of blacks in the relevant labor market—this fact was acknowledged by plaintiffs' expert. (T. 1108) The most relevant data available for this purpose were as of December 31, 1978, that 51.9% of the total prisoners in Arkansas correctional facilities were black. Defendants' Exhibit 7A–3 shows that between the years 1975 and 1977 blacks constituted 54.5% to 58.4% of those individuals convicted of a felony in the SMSA (Pulaski and Saline Counties).

A work force snapshot of defendants' entry level police officer position for the years 1975 to October 8, 1981, revealed no statistically significant difference between the percentage representation of blacks and the assumed relevant labor market percentage of 10.6%, except for the year 1975. (Defendants' Exhibit 7A–4) This exhibit uses the same basic statistical methodology as that contained in Plaintiffs' Exhibit 1, Table C. That is, it used an exact binomial distribution test, similar to that used in *Hazelwood School District v. United States*, 433 U.S. 299, 97 S.Ct. 2736, 53 L.Ed.2d 768 (1977). Defendants' Exhibit 7A–4 demonstrates that although the total work force has remained relatively stable from 1975 to October 8, 1981, the black representation in the work force has increased from 6.3% to 7.2%, which is an increase of 14.3%. (See T. 1114 for similar computation through 1978.)

In view of the fact that the inclusion of personnel actions (such as hiring) that occurred prior to 1972 (when Title VII was first applied to municipalities) in work force statistics will produce biased results (see *United Air Lines v. Evans, supra*), Dr. Baker prepared Defendants' Exhibit 7A–5. In Exhibit 7A–5 the work force as it existed at mid-year 1975 was adjusted to exclude all persons, black or white, who had been hired prior to March 1972. This demonstrated the substantial difference between the black and white ratios for pre-Act hires and the black and white ratios for post-Act hires. The pre-Act group excluded was 4.1% black, while representation of blacks among the post-Act work force was 8.1% black. Once this adjustment has been made, there is no longer a statistically significant difference between the percentage representation of blacks in the relevant labor market (10.6%) and their representation in the LRPD (8.1%) for 1975. This adjustment was not done for any years other than 1975 because that was the only year in Exhibit 7A–4 where blacks were statistically significantly underrepresented. (T. 1116)

An analysis of the hiring pattern of the LRPD for the years 1975 through October 8, 1981, showed that blacks as a percent of new hires were 10.5%, which is not a statistically significant difference from the relevant labor market of 10.6%. (Defendants' Exhibit 7A–6) An analysis of the hiring practices of the LRPD by year from 1972 through October 8, 1981, failed to show any statistically significant underrepresentation of blacks among new hires. (Defendants' Exhibit 7A–7) The only statistically significant result contained in this exhibit was 1981 where there was a statistically significant overrepresentation of blacks among new hires. (T. 1119)

Although no blacks were hired in 1977 and 1978, the discrepancy between the numbers of black and white new hires in 1977 and 1978 is not statistically significant in either year. (Defendants' Exhibit 7A–7) If the LRPD had hired one black in each year, the percentage representation of newly hired blacks would have been well over the 10.6% benchmark. (T. 1119)

Defendants' Exhibit 7A–8 demonstrates an absence of a so-called chilling effect upon black applicants for promotion to sergeant on October 1, 1978, and November 5, 1979. For example, 11 blacks were eligible to apply for promotion to sergeant on November 5, 1979, and 152 whites were eligible. The percentage of the blacks applying was 81.8% and that of whites was 40.8%. For this date there was a statistically significant overrepresentation of blacks among the applicants for sergeant.

Defendants' Exhibit 7A–9 sets forth a step-by-step analysis of the promotion process to sergeant on August 1, 1978, and November 5, 1979. The ratio of black to white applicants who were certified by the CSC was, in 1978, 85.6%, and in 1979 it was 229.7%. In neither year was there an adverse impact on blacks under the Four-Fifths Rule. It should be noted, however, that the certification rate of blacks in 1979 exceeded that of whites far in excess of that which would be tolerated under the Four-Fifths Rule. When the promotion rates of blacks and whites who were certified on the sergeant lists in 1978 and 1979 are compared for the August 1, 1978, test date, there appears to be a violation of the Four-Fifths Rule. However, an inference of adverse impact is not warranted because if the one black who was certified had been promoted, the selection rate of blacks would have exceeded that of whites by more than the acceptable standard. The answer to question No. 21 of the Uniform Guidelines (44 F.R. 11996) provides that an inference of adverse impact cannot be made in situations such as this:

"If the numbers of persons and the difference in selection rates are so small that it is likely that the difference could have occurred by chance, the Federal agencies will not assume the existence of adverse impact, in the absence of other evidence. In this example, the difference in selection rates is too small, given the small number of black applicants, to constitute adverse impact in the absence of other information ... If only one more black had been hired instead of a white the selection rate for blacks (20%) would be higher than that for whites (18.7%). Generally, it is inappropriate to require validity evidence or to take enforcement action where the number of persons and the difference in selection rates are so small that the selection of one different person for one job would shift the results from adverse impact against one group to a situation in which that group has a higher selection rate than the other group."

The above examples demonstrate the difficulties encountered in using the Four-Fifths Rule in making inferences about the existence of adverse impact when there is a "small number" problem. Dr. Lee Hoffman, plaintiffs' expert witness, recognized the existence of this precise problem. (T. 1128–29) He also suggested in his deposition, as read into the record, that the existence of such a "small number" problem "necessitates using the statistics that are appropriate for small numbers." When asked for examples of such appropriate tests, Dr. Hoffman responded, "Oh, such as Fisher's Exact Probability Test."

Defendants' expert agreed that this is the appropriate test to use, and the results of such a test for the sergeant test dates on August 1, 1978, and November 5, 1979, were introduced into the record. This analysis supplements the Four-Fifths Rule analysis and leads to the conclusion that in both years there is no adverse impact against blacks in either the certification or promotion results.

Defendants' expert, Dr. Baker, testified that this analysis was not subject to the so-called "repeater problem" because there was no aggregation of test results over the two years; he also stated he had conducted another statistical test, the Chi-Square with Yates' correction, which led to the same conclusion. (T. 1131)

From 1975 to 1981, blacks received 8.7% of the total number of promotions for all ranks at the LRPD (Defendants' Exhibit 7A–11; T. 1134), even though they constituted only 6.5% of the work force. (Defendants' Exhibit 7A–11) Additionally, a year-by-year analysis of the promotion data for all ranks showed no statistically significant difference between the promotion rates of blacks and whites, given the black representation in the work force.

The record also reflects that the average number of days prior to promotion to sergeant for whites is 3,852 days, whereas the average number of days for blacks prior to receiving promotion is 2,912. This computation includes the acting sergeants. If acting sergeants are excluded from the analy-

sis, the average number of days prior to promotion for whites exceeds that of blacks by approximately a factor of two, that is, 4,002 days (whites) compared to 2,042 days (blacks).

The last two defendants' exhibits presented in their case in chief, 7A–13 and 7A–14, compare, as of October 8, 1981, the percentage representation of blacks in two selected divisions and all other divisions. Defendants' Exhibit 7A–13 demonstrates that there is no statistically significant underrepresentation of blacks in the Investigation and Apprehension Division compared to all other divisions, while Defendants' Exhibit 7A–14 shows that blacks are not overrepresented in the Patrol Division as compared to all other divisions. Further, since these comparisons are as of a certain point in time, there is no possibility that the analysis could be subject to the so-called "repeater problem" which plaintiffs have suggested.

Defendants' Exhibits 7B–1 and 7B–2 are similar to Plaintiffs' Exhibit 1, Tables A and B. Both exhibits reflect the assumption that within the past decade the relevant labor market for blacks between the ages of 20–44 and who have at least a high school education grew from 10.6% in 1970 to 12.1% in 1980. This reflects the assumption that black representation in this age group with this educational attainment grew at the same rate during the last decade as that of the black general population in the SMSA. Thus, based upon these two exhibits, defendants' expert proceeded to analyze how this change in the relevant labor market affected earlier analyses. (Defendants' Exhibits 7B–3 through 7B–7) The first of these exhibits shows that the assumed relevant labor market of 12.1% does result in a statistically significant underrepresentation of blacks in the police officer entry position for all years from 1975 through October 8, 1981. (Defendants' Exhibit 7B–3) However, removing the effects of pre-Act hiring

decisions from the 1975 work force data (Defendants' Exhibit 7B–4), and from the 1981 work force data (Defendants' Exhibit 7B–5), shows that when the analysis is properly adjusted, there is not a statistically significant deficit of blacks in either year. These adjustments were not made for 1976 through 1980 since the adjustment for 1981 would represent the "worst possible case" approach for defendant. Consequently, in each of the intervening years, when the data are properly adjusted to exclude pre-1972 hiring actions, there would not have been a statistically significant underrepresentation of blacks.[5]

The assumption of the 12.1% relevant labor market figure is conservative since it does not take into consideration the crime figures.

Using this labor market percentage adjusted to reflect the 1980 census data, there is no statistically significant underrepresentation of blacks among persons hired in the period 1972 to October 8, 1981.

When acting sergeants are included in the analysis of the Four-Fifths Rule to sergeant's data, there is no adverse impact for any step in the selection process. For example, between 1975 and 1979, of the percentage of those blacks who took the sergeant's test, there were 11.1% promoted, whereas for whites the comparable figure was 8.1% according to defendants' exhibits. In fact, the exhibit offers support for the conclusions stated by plaintiffs' expert in his letter of December 18, 1981: "An inspection of the data for sergeant promotion actions for the period covered in the table above does not show significant racial differences. This suggests that it is possible for promotion of police officers to sergeant to be administered in an even-handed manner."

If the number of blacks promoted in the 1975–1979 period had been two, the selection rate for blacks would have exceeded

---

5. The general population is not the relevant labor pool. The figures must be narrowed to include only persons in the appropriate age group who possess the necessary qualifications for a position with the LRPD and who do not

have any felony convictions. See *Hazelwood School District v. United States, supra; Pouncy v. Prudential Insurance Company, supra*; and *Paxton v. Union National Bank*, 519 F.Supp. 136 (E.D.Ark.1981).

that of whites; that is, the selection rate of blacks would have been 20.0% compared to 17.1% for whites.

A generally used statistical test, the Chi Square Test, proves that the difference between the hire rates of blacks and whites is not statistically significant. (T. 1171) Defendants' expert, Dr. Baker, testified that the difference in hire rates for blacks and whites could be attributable to a number of factors such as chance, the background check, and failure to complete the application process. Plaintiffs' expert made no attempt to determine the factors which might account for the difference in the hire rates for blacks and whites and explicitly stated that he had no knowledge of the number of applicants who were not hired because of felony convictions, lack of a high school education, or failure to meet the age requirements. (T. 386)

Plaintiffs assert that the LRPD improved its practices after this suit was filed in September 1978. An analysis of the black representation among the police officer level in the years 1975 through 1978 reveals no adverse impact in promotions using either the 1970 census data, or the 1980 census, when the effects of pre-Title VII hiring decisions are excluded as they should be. (Defendants' Exhibits 7A–5, 7B–4, 7B–5)

It is also noted that defendants' hire rates meet required standards for the years 1975–1978 under either the 1970 or 1980 census. (Defendants' Exhibits 7A–7 and 7B–7) To the extent that the defendants' hiring and promotions have included even more blacks since 1978, they should be commended.

Although Dr. Baker's analyses were made prior to the United States Supreme Court's decision in *Connecticut v. Teal, supra,* the case is distinguishable from the case at bar and would not affect his conclusions. In *Teal,* the plaintiff in a Title VII case established a *prima facie* case of racial discrimination by establishing that a component part of a selection process produced a disparate impact against blacks, even though there was no "bottom line" impact against blacks. The only part of the LRPD promo-

tional examinations for sergeant and lieutenant that serves as a pass/fail barrier is the written test, and it has no adverse impact on blacks. For example, on the 1978 lieutenant's examination the black (Grady Anthony) made a score of 88.00; the white average score was 85.86. On the 1979 lieutenant's written examination, Grady Anthony made a score of 82.00; the average score for whites was 90.44. On the 1978 sergeant's written examination, the black average score was 87.83; the white average score was 87.61. On the 1979 sergeant's written examination, the blacks' average score was 86.66; the whites' average score was 82.29. The 1982 lieutenant process is different because of a requirement in the consent decree entered in the *Best and Thomas v. Booth* state court case (Defendants' Exhibit 9), the oral examination (with no cutoff) was given first. The written examination was given second and it did have a passing score of 76. Grady Anthony, the only black, made 64.5 (Defendants' Exhibit A) However, neither test operated as a barrier; he was allowed to participate in both examinations.

Other analyses also reflect there is no adverse impact in any of the subparts of the promotional process.

The seniority ratings are not subject to the adverse impact theory because they have been specifically exempt in Section 703(h) of Title VII, and the LRPD seniority system was not in any way racially biased or slanted. See *Pullman-Standard v. Swint,* —— U.S. ——, 102 S.Ct. 1781, 72 L.Ed.2d 66 (1982).

On the 1979 lieutenant promotional process, the average oral score for whites was 64.51; Grady Anthony's was 60.77; the average composite score for whites was 72.17; Grady Anthony's was 67.76. (Joint Exhibit 21)

On the 1978 sergeant promotional process, the whites' average oral score was 54.-29; the blacks' average oral score was 54.-05; the whites' average service rating was 90.43; the blacks' average service rating was 89.94; the whites' average composite score was 75.37; the blacks' average composite score was 74.61. (Joint Exhibit 16)

On the 1979 sergeant promotional process, the whites' average oral score was 63.-97; the blacks' average oral score was 65.-45; the whites' average composite score was 74.79; the blacks' average composite score was 77.10. (Joint Exhibit 17)

Regardless of race, it generally takes a long time to be promoted to sergeant, if ever, at the LRPD. For every plaintiff herein who feels he should have been promoted, there are many whites in the same position. The Department's seniority list as of January 8, 1982 (Defendants' Exhibit 16), indicates that H. L. Callanen, R. A. Walton, W. L. Essley, Earl Hutchins, Dwight Marrow, and J. C. Hester have all been with the Department over 20 years but have never been promoted. All are white. Lowell Capoot, Adron Agee, Rex Hargis, James Seats, Delton Anderson, Richard Walton, Gerald Wayne Harper, Bruce Hause, Billie Wood, Thomas Johnston, Willie Bryant, Roger Ridge, Hardy Forrest, Floyd Van Horn, Truley Stone, Reuben Linder, Ivan Jones, and Jimmy Hardester have all been at the Department between 10 and 20 years, but none have been promoted. All are white.

Lieutenant James Vandiver, white, took the sergeant's examination five times before he was promoted after 9 years with the Department in 1974. He testified that he had no expectations to be promoted because sergeants usually had been at the Department 10 years before promotion.

Lieutenant Paul Plummer, white, took the sergeant's examination three or four times before he was promoted after 8 years at the Department. He "died" on the same list that Johnnie Gilbert did in 1974. He did not get on the list the first time he took the lieutenant's examination. The second time he took the test he got on the list but was not promoted. He finally was promoted as a result of the 1979 lieutenant's examination. (T. 730–732)

There are many other whites in the LRPD whose records reflect similar experiences. They are as follows:

Sergeant Carthel Watters, white, had to take the sergeant's test four or five times before he was promoted after 8 years at the Department and was on the list four times before being promoted.

Chief Simpson made 99 on the assistant chief's test and did not even make the list in 1976. That same year he made 97 on the captain's test and did not make the list. He testified that he has seen a number of occasions where people go up and down the lists from year to year without being promoted. He has seen people at the top of the list not be promoted because there was no vacancy. In 1967 he was number two on the list. The next year he was number one, and the man who had been number one the previous year was number two.

Randy Reed, white, who began work with the Department in 1973, has taken the sergeant's examination three times but has never been on the list.

Detective Jim Long, white, has taken the sergeant's examination five or six times. He has made 100 on the written test and has not yet been promoted. He also has not made the list every year.

In 1978 Bob Anderson, white, made 99 on the written examination and did not make the list.

Thomas Johnston, white, was hired in 1968 and has taken the sergeant's examination every year since 1972 but has never even been on the list.

Albert Miller, white, has a bachelor's degree and has never even made the sergeant's list.

Jim Aulwes, white, has a bachelor's degree in criminal justice and 18 hours toward a master's degree in criminal justice administration, has taken the sergeant's examination three times, but has not been promoted.

Bert Jenkins, white, and Roy Goodwin, white, have "died on the list" and not been on the next year's list.

Vacancies occur infrequently at the LRPD. Some years there are no vacancies at all in a given rank. (T. 1392) The fact that someone is not promoted does not mean that they are not qualified. The Department is simply not designed for every-

one to ultimately be a sergeant or above, although all are given the opportunity to progress.

The Personnel Director announces a promotion selection cycle at least once each year for promotion to the classifications of sergeant, lieutenant and captain. Promotion selection cycles are conducted for the classifications of assistant chief and chief only as required to fill a vacant position. The Personnel Director announces a written test for those promotion classifications requiring a written test, listing the sources of material used in its construction, and minimum cutoff score at least 30 days before the test. The Personnel Director announces the percentage weight of each rating factor and the procedures surrounding each as it applies to the overall composition of the promotion process. Some of the factors used either in the past or in the present (although not necessarily all at the same time) are: a written test, a structured oral test, performance appraisal (these are reports which are completed on each sworn officer twice annually, and the average rating of the two most recent reports provides the points for the performance appraisal factor), seniority, and chief's points.

Seniority is accrued at the rate of five points per year of active uniformed service in the Department, to a maximum of 100 points. The Officer of Personnel coordinates the oral interview, advises and instructs the oral panel members on the proper interview and rating procedures, and briefs the eligible candidates on the factors to be rated immediately prior to appearing before the oral panel. To be eligible to compete for promotion the candidate must be a permanent police officer serving on active status in a certain classification for a given amount of time. The amount of time necessary has varied over the years. The CSC is to certify candidates for promotion in rank order from the highest composite score. Promotions are to be made in order beginning with the candidate in first standing. Candidates for promotion may review their examinations and personally receive information as to the score received on all rating factors. (Joint Exhibit 35, No. 22).

The defendants have presented very detailed evidence of the promotional process of the LRPD. The Court has determined that the procedures are fair and have no adverse impact on blacks. It would serve no useful purpose to review all the various steps and safeguards taken in the process but the Court will refer to some of the highlights.

Presently, the LRPD has five captains on the oral panel for sergeant's examinations. The Personnel Department decided to use this method. Chief Simpson is responsible for making sure that the captains meet their responsibility to the Personnel Department. The Personnel Department trains the panelists in the proper and objective method to conduct the interviews and to rate the candidates.

The sources of the questions on the examinations are the LRPD Policies and Procedures Manual; the LRPD Rules and Regulations (all officers have copies of both); the Arkansas Criminal Procedure Manual; the ARCO book; and the Arkansas Criminal Code. Candidates are notified of the examination dates and the sources of the examination questions. All candidates have plenty of notice as to what to study well in advance of the tests.

Chief Simpson no longer gives "Chief's points" for the sergeant promotional process because objection was made to the former method as being too subjective.

The written examination is only one part of the promotional process. The oral interview, seniority, and performance appraisals are also considered. One may go on to the oral interview, if one passes the written test.

The oral examination is a necessary part of the total promotional process because there are many facets of a supervisor's position that cannot be adequately measured by a written examination, e.g., communication skills, performance under stress, and ability to reason. It is also important to select an applicant who can work harmoniously with co-workers and present a forceful public image. These traits cannot be discovered from a written examination only.

In 1978 there were thirteen promotions at LRPD and one black was promoted. In 1979, five persons were promoted, including one black. For the two-year period, two-eighteenths of the promotions went to blacks or 11%, while the work force was approximately 6.5% black. In 1978, one-thirteenth of the promotions represents 7.6% while the work force was 6.1% black. (Defendants' Exhibit 7A–11)

External factors such as stress, illness, and personal problems can affect how the candidates perform on the tests. Obviously, the failure to study can significantly affect an individual's test results. The oral panelists do not know the candidates' written scores.

The professionals in the classification and compensation section of the Little Rock Personnel Department develop the job analyses, which are used in the construction of promotional examinations. Joint Exhibits 12A, B, and C are job analyses for the ranks in the LRPD. The job descriptions list the duties and tasks performed in each particular position; they are determined through job audits conducted by the classification and compensation section of the Personnel Department. The job specifications outline the skills, knowledges and abilities that are required in the performance of the particular positions. These skills, knowledges and abilities are also determined by job audits. The job specifications also outline some examples of work in each position, and the acceptable level of experience and training for each person.

The job analyses used by the Little Rock Personnel Department in the construction of promotional examinations for sergeant and lieutenant in 1978 and 1979 accurately and thoroughly described the job duties of sergeant and lieutenant as they existed when the tests were given. Chief Simpson and Captain Norman Mallett verified this, based upon their 20 years of experience in the Department and their day-to-day experience as supervisory officers. This was also verified by Curt Dawson who has been a personnel analyst with the City of Little Rock since April 1980 and is in charge of test development. He has a bachelor's and a master's degree from the University of Central Arkansas.

It is clear that the LRPD examinations for sergeant and lieutenant (both oral and written) are carefully developed in accordance with accepted professional standards and that they are closely related to the jobs for which they are used. The sources used for the examination questions are highly relevant to the sergeant's and lieutenant's positions in the LRPD. Also, the structured oral interview is a necessary part of the promotional process [6] and not a barrier to favor one group over another. Its objectivity is safeguarded and there is little likelihood of bias or subjectivity playing a part in the rating of the candidates.

Defendants also demonstrated through the testimony of Dr. Robert Ochsman [7] that their promotional processes for sergeant and lieutenant in 1978 and 1979 are content valid in accord with the Uniform Selection Guidelines. He testified that the procedures were standardized, well structured, and the oral examinations were of high quality. (T. 932–933)

Dr. Ochsman soundly refuted Dr. Outtz's testimony that because some candidates' scores on the oral and written tests do not correlate with each other, the oral interviews are suspect. (Outtz, T. 75) Just because someone might score high on the written test but does poorly on the oral examination does not mean that the oral is invalid. One reason different assessment techniques are used is to measure different qualities or attributes of an individual.

---

6. The oral test measures the candidate's stress tolerance and evaluates an individual's ability to formulate an appropriate course of action in a particular situation. The test also measures the candidate's social skills, which are important in supervisory positions and in making public appearances. It is appropriate that the oral examinations be used by the LRPD in its promotional process. (T. 930–32)

7. Dr. Ochsman had a long list of credentials and was eminently qualified to testify as an expert in test validation.

Some mention should be made of the state court litigation. Shortly after the 1979 sergeant's eligibility list was certified (Joint Exhibit 17), two police officers (Adams and Seats) filed suit in the Pulaski County Circuit Court to void the results of that promotional process. An injunction was entered against permanent appointments of sergeants from that list. (This case was later considered with the *Best and Thomas* case.) Racial discrimination was in no way related to the state court lawsuits. Adams and Seats contended that the process was invalid because performance appraisals had not been included in the promotional process.

However, vacancies for sergeant needed to be filled. Because two blacks, plaintiff Horace Walters and plaintiff Billy O'Donald, were ranked high on the 1979 enjoined list, Chief Simpson made his appointments to acting sergeant from that list *exactly* as he would have done had the list never been enjoined. Horace Walters and Billy O'Donald would have been, as a natural result of the LRPD promotional process, made permanent sergeants, if the state court case had not been filed. (T. 1433, 1435–36) Each of the acting sergeants (six whites and two blacks) was informed that there was no guarantee the promotion would be permanent. (T. 1435–1437)

In November 1981 a decision was rendered by the circuit judge in which he held that the process was null and void because performance evaluations had not been included. The judge in his opinion stated, "The oral examination portion of the testing procedure was well done and the court is satisfied with that procedure."

Plaintiffs have insisted that the promotion policies of the LRPD have a "bottom line" adverse impact against blacks. In order to justify their contention they have not included the acting sergeants in the number of promotions from 1975 through 1981. On the surface, this argument seems logical because the acting sergeants were not made permanent by the circuit court. However, this argument overlooks the fact that if the LRPD promotional process had been al-

lowed to function, without intervention, it would have resulted in the promotion of two more blacks to the rank of sergeant in 1979. In other words, Horace Walters and Billy O'Donald would have been permanent sergeants as a result of the promotional process developed and implemented by the Little Rock Personnel Department, if the nonracially motivated state court lawsuit had not been filed.

Of course, the Court cannot view the case from the "bottom line" approach only. See *Connecticut v. Teal, supra.* The court held in *Teal* that to measure disparate impact *only* at the "bottom line" ignores the fact that Title VII guarantees the individual black respondents the *opportunity* to compete equally with white workers on the basis of job-related criteria. *Teal* held rights under § 703(a)(2) have been violated unless it can be demonstrated that the examination in question was not an artificial, arbitrary, or unnecessary barrier but measured skills related to effective performance of the position in question.

The Court finds herein that the promotional process of the LRPD does not constitute an unnecessary barrier but is basically fair, and the testing procedures measure skills related to effective job performance.

All plaintiffs and intervenors were successful applicants, *i.e.*, hired, and although some have been disciplined, none have been discharged. The Court will now consider the allegations of the individual plaintiffs and the defenses made to those allegations by the defendants.

### Grady Anthony

Grady Anthony was hired by the LRPD on December 3, 1969. He was transferred from Patrol Division to Community Relations and Training in August 1971; from Community Relations to Administration; from Administration to Patrol in January 1977; and to Investigation and Apprehension on November 17, 1981. He was promoted to the rank of sergeant in July 1975. Anthony has been given many in-service and special training courses while employed at the LRPD, and he was named Officer of the Month twice.

Anthony failed the test for promotion to lieutenant which was given in December 1976 but passed the test given for promotion to lieutenant in January 1978. He was ranked fourth on the list which was certified on February 17, 1978. Anthony passed the test given for promotion to the rank of lieutenant in April 1979. A written test was given in May 1980, but further testing was enjoined by a state court as a result of litigation which challenged the validity of the lieutenant's examination.

Anthony alleges that he was discriminated against because of his race in 1978 because he advanced from fourth to second place on the eligibility list and was not promoted. The record indicates that only two people were promoted from that list, and the white officer who advanced to first on the list was not promoted either. After a list expires, everyone, white or black, has to start the testing process all over again. A number of whites who were qualified for promotion were not promoted, even though they had made it to the eligibility list and had then progressed to a high position before the list expired.

Anthony's belief that he was discriminated against in 1979 because he was ranked fifteenth on that list, but had been ranked fourth in 1978, is also unfounded. Substantial evidence was introduced that whites as well as blacks are subject to "dying on the list" and subsequently ranking lower the next year. There is nothing racially discriminatory about a system that affects whites and blacks equally.

The LRPD successfully rebutted Anthony's *prima facie* case of disparate treatment in the denial of an appointment to acting lieutenant in 1980. Chief Simpson could not appoint any permanent lieutenants due to the injunction entered in the Pulaski County Circuit Court on September 10, 1979, and had to exercise his emergency powers to appoint an acting lieutenant to fill a critical vacancy. His method of appointing acting lieutenants was the best he could do under the circumstances and was not intentionally devised to discriminate against Anthony.

The issue is not whether Grady Anthony is qualified to be a lieutenant—the Court finds that he is well qualified, as are a number of whites; however, the issue is whether he was *not* appointed acting lieutenant in 1980 because he is black. The reasons given by the City regarding its employment actions were reasonable and not pretextual. Consequently, Anthony failed to prove that he was denied promotion because of his race.

As a part of the consent decree entered in the state court action, the next promotion process was to begin with the oral examination. This was done on December 8, 9 and 10, 1981. Three captains and 2 assistant chiefs (including Clarence Hunter) conducted the oral examination. The written examination was given on January 19, 1982. Anthony participated in the oral and written examinations for lieutenant given in December 1981 and January 1982, respectively. Anthony did well on the oral examination but failed the written examination. The passing score was 76 and he made 64.5. Anthony then filed a motion for a temporary injunction against the appointment of any lieutenants from the 1982 process. A hearing was held on February 4, 1982, at which time Grady Anthony claimed that he was being held back because of his race. He testified he had not studied for the examination because he had been under stress during the trial of this action and that he should not have been required to take the examination at the scheduled time. Anthony also claimed that he had not been given adequate notice of what to study for the examination.

The City introduced convincing evidence that Anthony had been notified of the test date and the sources of the material that it would cover in plenty of time to prepare for the test. On November 23, 1981, the upcoming testing process was announced and the dates of testing were given. On December 10, 1981, the sources of test questions were announced (*i.e.*, the LRPD Police Manual, ARCO Book, Rules of Criminal Procedure, Arkansas Criminal Code, LRPD Rules and Regulations, and high-school-lev-

el English, grammar and spelling books). Notices were sent to each candidate after the oral examination. Extra copies of the announcements were sent to the LRPD for posting. The announcement of the written examination was posted on the bulletin board in the Detective Division where Grady Anthony is assigned two to three days after the oral examination.

The City did not discriminate against Grady Anthony by giving the 1982 lieutenant's test during the trial of this action. Judge Digby's order required that the new lieutenant's list be promulgated within 120 days of the entry of judgment. In order to comply with that order, and with the CSC regulations which provide for a 7-day review period and 15 days between the giving of the test and certification, as well as 2 days after the test before the review period begins, the Personnel Department *had* to give the test on that day. It had no other choice.

Grady Anthony had a total of 114 hours leave from November 23, 1981, through January 19, 1982. None of the plaintiffs were required to work any duty assignments on the days that they were in trial.[8] Grady Anthony never mentioned to Chief Simpson that he had not been able to study. The Court gave Grady Anthony permission not to be at the trial on the Monday before the examination on Tuesday. Of course, in a civil trial it is not required that any plaintiff be present throughout all the proceedings.

Eighty items from the 1980 examination (on which Anthony scored 100) for which he had studied were used in the 1982 test, word for word. Scores for these items totaled 80 out of the possible 100 points. Grady Anthony missed 24 of these identical items in 1982 that he had gotten right in 1980. In spite of his contentions, the test does not improperly impact upon blacks, but instead the low test score resulted from lack of study.

Defendants' Exhibit 7A–12 showed that blacks spent only 2,042 days (on the average) as police officers before being promoted to sergeant while whites spent (on the average) 4,002 days. This computation covers promotions between January 1975 and June 1981 and excludes the acting sergeants. When the acting sergeants are included, whites spent (on the average) 3,852 days as police officers before promotion to sergeant, and blacks spent (on the average) only 2,912 days. This is one indication that blacks are not being deprived of advancement opportunities at the LRPD.

The Court was impressed with Sergeant Anthony's intelligence and experience and concludes that, based on all of the evidence, his chances for promotion are great, if he studies for the next examination. However, Anthony failed to show the actions of the LRPD were pretexts in his case.

### Billy O'Donald

Billy O'Donald was hired by the LRPD on April 9, 1970. On April 14, 1980, he was promoted to the rank of acting sergeant. He is presently in the Patrol and Auxiliary Division. Billy O'Donald was named Officer of the Month in July 1979 and again in January 1980.

O'Donald failed the written examinations for promotion to sergeant given in March 1975 and March 1976. He passed the written examinations for promotion to sergeant given in July 1978 and November 1979. He was ranked second on the eligibility list which was certified on December 20, 1979, and was promoted to acting sergeant as a result of this certification on April 14, 1980. The system which plaintiffs are attacking would have produced two black permanent sergeants (Billy O'Donald and Horace Walters), if it had not been enjoined in state court.

Billy O'Donald's 3-day suspension for missing a court appearance, where the subject was charged with armed robbery, was deserved and was not racially motivated.

---

**8.** (Hearing T. 87) According to the testimony of Chief Simpson, "all of the time that they spent here in court was paid for by the City, if they were scheduled to be on duty during that 24 hour period." Anthony was paid for 76 hours.

Missing court is a serious offense; testifying in court is a basic part of a police officer's responsibility to pursue an arrest through disposition. Whites have also been disciplined for this offense. Defendants' exhibit reflects the following: Janice Willford, white, was suspended 30 days for missing criminal court; Stephen Young, white, was suspended 5 days for missing traffic court; Janice Willford, white, received a 5-day suspension for failing to appear in traffic court on another occasion; Philip White, white, Stephen Young, white, and Janice Willford, white, were suspended 1 day for missing traffic court; and T. L. Bridges, white, received a 1-day suspension for failure to appear in court.

Billy O'Donald's suspension was upheld on appeal to the Pulaski County Circuit Court by Judge Perry Whitmore who called the suspension an "appropriate exercise of the discretion" of Chief Simpson and the CSC. Judge Whitmore stated, "Members of the Police Department should be particularly attentive to attending court in the prosecution of a criminal matter."

The 30-day suspension that Billy O'Donald received in 1972 was also deserved. He testified that he was late to work one day and was sent home by his supervisor. Being displeased with this action, O'Donald did not show up for work the next day. For this he received a 30-day suspension, which was warranted by O'Donald's behavior and was not racially motivated. Whites receive equal discipline for such offenses. For example, Scott Stebenrauch received a 30-day suspension for absence and neglect of duty, playing cards at a fire station during duty, and leaving his beat.

Billy O'Donald admitted that he knows of whites who are sergeant material and have taken the test but have not been promoted. (T. 162) Many white police officers have more seniority than O'Donald and have not been promoted to sergeant. (Defendants' Exhibit 16) Defendants rebutted O'Donald's *prima facie* case of failure to promote based on the promotional system. O'Donald failed to prove that the system was a pretext.

### Marcella Wilson

Marcella Wilson was hired by the LRPD into the Patrol Division on July 29, 1974. He was transferred from the Patrol Division to Organized Crime and Intelligence in January 1977, and from Organized Crime to Community Relations and Training in May 1978.

Wilson has never applied for promotion to sergeant as he thinks it would be useless. He is of the opinion that the tests discriminate against whites as well as blacks. (T. 190) Wilson also thinks that former Assistant Chief Hunter, black, would not be fair in the oral interview. Wilson testified that he has no complaints about transfers because he received the one that he requested. He also has no complaints about off-duty assignments. (T. 188, 189)

Wilson contends he did not get to go to a school conducted by Drug Enforcement Administration [DEA] because he is black. Wilson has received extensive in-service and special training both in Arkansas and outside this state during his employment at the LRPD. The fact that he did not get to go to a DEA school, as he requested, is not unusual because everyone cannot go to every school. There are many considerations, including the needs of the Department. Wilson has gone on recruiting trips to organizations and schools to attract minority applicants.

Wilson testified that he trained everyone in the use of the crime-eye camera, but Lee Herrod and Albert Miller both gave credible testimony to the contrary.

Wilson also received a 30-day suspension for driving while intoxicated on December 5, 1977, and wrecking a police vehicle. After the wreck, Wilson's supervisors recommended that he be fired. Wilson told Chief Simpson that, if he received another chance, he would do better. Chief Simpson was persuaded and did give him another chance. This does not indicate racial discrimination against Wilson but, instead, an understanding boss.

Wilson is in charge of the felony photography program, which involves the installation and maintenance of surveillance cameras in locations with high robbery rates. The Department policy is to check the cameras once a month, also to call and check on each camera on each business day to make sure that they are working. If one is not functioning, it is supposed to be fixed immediately.

Marcella Wilson was derelict in his duty when a drugstore on Markham Street in Little Rock was robbed. Two cameras in the store were not functioning at the time of the robbery. Before the robbery, the druggist had contacted the LRPD twice about the problem, and the Department had contacted the druggist three times, but no one had gone to the drugstore to fix the cameras. The cameras had been inoperative a week or more when the robbery occurred. It was Marcella Wilson's responsibility to see that the cameras were fixed.

Another questionable incident involved the murder of a clerk at a U-Tote-M store in Little Rock when the surveillance camera was not functioning.

The record indicates that Wilson does not keep up with the duties and responsibilities of his position. Lee Herrod, Albert Miller, and Faith Sanders have helped him catch up with his camera maintenance and alarms. Marcella Wilson's workload is not above average but he needs assistance frequently. Other employees (white or black) in this position have not fallen behind in their work. (T. 866–867)

It appears to the Court from the above facts that Marcella Wilson has not proved that he is qualified for the position of sergeant at this time. It is also noted that some white officers having many years more service than Officer Wilson have not been promoted to sergeant.

### Jack Matlock

Jack Matlock was hired by the LRPD February 10, 1975, and has served in the Patrol Division. He passed the examination for promotion to sergeant given in July 1978. He failed the examination given for promotion to sergeant in November 1979. He claims that he was discouraged after not being promoted as a result of the 1978 test so he did not study. The 1978 test was the first test for promotion he had taken, and in 1979 he had only been employed at the LRPD for 4 years.

The Court finds Matlock's failure to study for the test was the reason for his failure to pass; his race had nothing to do with it. He admitted that he knew of no white officers who had been promoted to sergeant after only 3 years on the job.

He was disciplined for not wearing his hat, but not as a result of his race. He had been warned by his supervisors repeatedly to abide by the LRPD rules and regulations to wear his hat, yet he continued to violate this rule. The occasions on which Matlock was seen without his hat were not within the exception to the rule that hats must be worn at all times.

Matlock deservedly received progressive disciplinary measures, beginning with oral counseling, and next a reprimand, for his consistent failure to abide by this rule. Once, in 1977, Sergeant Watters even brought him his hat when he was investigating an accident without it and gave him a warning to wear it in the future. Some of the reasons for the rule are that it helps an officer to be easily identified, for his safety as well as that of the public; and that it looks more professional and helps maintain the desired image of a police officer. Matlock's claim that whites are not disciplined for the violation of this rule is unfounded; a white officer was also given a reprimand for not wearing a hat at the same time that Matlock was given a reprimand.

Matlock has not proved that he is qualified to be promoted to sergeant. In addition to his repeated disregard for the hat regulation, he had five wrecks between 1975 and 1980. He has been reprimanded for failing to discover a burglary at Haverty's and has received a reprimand for scuffling with a traffic violator. (T. 435–437) Matlock admitted that he knows of no ser-

geant who has had as many accidents as he has experienced. The record indicates that whites have also been disciplined for accidents.

White officers with more years of service have not been promoted, and the Court finds that Matlock has not been denied promotions because he is black.

### Horace Lee Walters

Horace Lee Walters was hired by the LRPD on May 21, 1972. He has been given the following transfers within the LRPD: from Patrol Division to Investigation and Apprehension, August 1973; from Investigation to Organized Crime and Intelligence, September 1974; from Organized Crime to Investigation and Apprehension, July 1975; from Investigation to Patrol, September 1980. On September 22, 1980, he was promoted to acting sergeant.

Walters failed the examination for promotion to sergeant given in March 1976 but passed the examination for promotion to sergeant in March 1977 and was ranked 31st on the eligibility list. No promotions were made from that list, however, because the eligibility list was declared invalid and in violation of state law by the Pulaski County Circuit Court in September 1977. The court order indicates this case had nothing to do with racial discrimination. (Joint Exhibit 35)

Walters passed the examinations given for promotion to sergeant in July 1978 and in November 1979. He was ranked sixth on the eligibility list which was certified on December 20, 1979, and was promoted to acting sergeant as a result of his test on September 20, 1980. His appointment was in the capacity of an acting sergeant instead of a permanent sergeant because of the state court litigation. If the system used by the Personnel Department had not been enjoined by the state court, it would have resulted in the permanent appointment of two black sergeants as a result of the 1979 promotion process.

Horace Walters' testimony that when he was a detective in the Burglary Section he was always number 1, 2, or 3 in arrest and clearance rates but was always second from the bottom in his efficiency ratings, is inaccurate. Sergeant Bob Smith, who supervised Horace Walters while he was in Burglary in 1976–1979, was the supervisor who completed Horace Walters' efficiency ratings. He testified that Horace Walters *did not* rank near the bottom in efficiency ratings. Out of eleven officers he evaluated, Walters came out fifth. The performance evaluation average for all of the officers was 91.3; Walters' average was 91.5.

In terms of cases handled in Burglary, Captain Pettyjohn testified as follows:

(a) For the last 6 months in 1975, Horace Walters handled 264 cases. One officer was lower, two were the same, and the high was 322.

(b) In 1976, Horace Walters handled 486 cases; the high was 493; there was a 491; and the low was 426.

(c) In 1977, Horace Walters handled 461 cases; there was a 502, a 426 and the low was 414.

(d) In 1978, Horace Walters handled 491 cases; the high was 564; the low was 407.

(e) In 1979, Horace Walters handled 477 cases; the high was 562; there was a 507; the low was 314.

(T. 1065–66)

All of the acting sergeants were informed as to the reason the appointments were temporary and Walters has not been denied promotions because he is black.

Although Horace Walters was recommended for Officer of the Month but did not receive it, this was not a result of racial discrimination. The Chief receives between three and seven recommendations a month, but only one can be chosen. At least two to six people fall into this category each month; some are black and some are white.

Even though allegations were made to the contrary, Walters admitted at trial that everyone is informed as to the sources from which the promotional examinations are to be derived prior to taking the tests. (T. 94)

Walters is in error in believing that the letter of reprimand he received in April 1979 for having his service revolver stolen was racially motivated and that whites who had also lost revolvers had not been disciplined. Walters testified that Sergeant Bill Lynch had lost his gun without receiving discipline; that Duane Chapman had lost two guns and a badge without discipline; that Bill Rives' gun had been stolen from his car and had not resulted in discipline; and that Roy Moomey's gun had been stolen without his receiving discipline.

The facts in the above incidents are different from the situation for which Walters received a letter of reprimand. Walters had visited friends out of town and had returned to Little Rock with a bicycle, which was too large for the trunk of the car, and Walters tied it down. He left his revolver in the car. During the night someone stole the bicycle and the gun. An investigation was conducted, and a reprimand was given because Walters was negligent in leaving the trunk lid unlocked. The weapon was later recovered in Arizona and it had been used in a murder. The suspect in that murder had been through the town where Walters had visited the weekend prior to the burglary. (T. 1478)

Sergeant Bill Lynch, an undercover narcotics officer, lost his revolver in 1978 during the nighttime serving of a search and seizure warrant at an old house in Pulaski County out of which drugs were being sold. The officers had information to the effect that the suspects were armed and would shoot to kill. Sergeant Lynch carried a shotgun in his hands and placed his revolver in his hip pocket. The gun fell as he was running up to the house with the shotgun in his hands. He tried to find the gun later, but there was too much undergrowth and metal rubbish therein to locate the gun. The weeds and foliage around the house, where the gun was lost, were waist-high.

Bill Rives' gun was stolen from his car, but unlike Horace Walters' case, Rives' car was locked at the time. A window was broken by the thief. Duane Chapman *never* lost a gun. He has lost one badge. Roy

Moomey's home was burglarized while he was on vacation. His television, stereo, and gun were stolen.

Thus it is evident that the instances where whites have not been reprimanded for losing their guns are distinguishable from Walters' case. By substantial evidence defendants have shown legitimate business reasons for their actions and Walters has not shown the reasons are merely pretextual.

Plaintiffs contend that Walters' demotion which occurred *after the trial of this action* was in retaliation for his having sued the defendants. In response to such assertion defendants attach exhibits to their post-trial brief showing a sound legal basis for Walters' demotion, but the Court has no right to consider matters outside the record.

### Larry Bazzelle

Larry Bazzelle was hired by the LRPD on July 29, 1974, and voluntarily resigned in February 1979. Immediately after resigning his position at the LRPD, Bazzelle joined the Arkansas State Police and shortly thereafter resigned that job.

Late in February 1979 Larry Bazzelle called Chief Simpson to request that he be rehired by the LRPD; his request was denied. The Arkansas State Police subsequently rehired Bazzelle.

The CSC rules allow for the reinstatement of an employee who left the Department in good standing, if the reapplication is made within one year of resignation. The decision is left to the department head's discretion, and each case is decided on an individual basis.

When Larry Bazzelle called Chief Simpson about returning to the LRPD, Chief Simpson had no personal knowledge of Bazzelle's job performance. Therefore, Chief Simpson contacted Bazzelle's former supervisors for their evaluations of his performance. They felt that his work attitude and attendance had not been exceptionally good. They also told the Chief about an incident in which Bazzelle had failed to perform his duty in accord with the require-

ments regarding the discharge of firearms. On this basis the Chief denied Larry Bazzelle's request to return to the Department. The Court finds no abuse of discretion in Chief Simpson's decision not to rehire Larry Bazzelle as it was not based upon illegal racial discrimination. The Chief has refused to rehire a number of whites who have requested to return, for example, Scott Moon, Ed Pridgen, and Bill Bates. On the other hand, some blacks have been rehired, among whom are Lonetta Chism and Officer King. (T. 1470–1471)

Randy Reed, who worked with Bazzelle when he first began work at the LRPD, testified that Bazzelle had a great deal of trouble in writing reports, spelling, and grammar.

Larry Bazzelle's award as Officer of the Year is not inconsistent with his less-than-satisfactory evaluations by his former supervisors, because the award largely resulted from his off-duty activities with youth.

Larry Bazzelle's *prima facie* case of disparate treatment in the denial of his request for rehire was rebutted by defendants. Chief Simpson's reasons for not rehiring Bazzelle were legitimate in view of his poor work and attendance record. Bazzelle failed to prove that these reasons were pretextual. Whites have been denied rehire and blacks have been rehired; there is no difference between blacks' and whites' success in obtaining reemployment at the LRPD. Larry Bazzelle's claim of discriminatory denial of rehire is a moot issue because he has no desire to return to work at the LRPD. Under *Backus v. Baptist Medical Center*, 671 F.2d 1100 (8th Cir. 1982), the issue is moot and requires no determination.

### Jessie Briscoe

Jessie Briscoe was hired by the LRPD into the Patrol Division on October 29, 1973. He was transferred from Patrol Division to Organized Crime and Intelligence in May 1978, and from Organized Crime to Patrol on November 17, 1981.

Briscoe failed the written examination given for promotion to sergeant in July 1978. He admitted that he had not studied sufficiently in preparation for this test. (T. 277) Briscoe passed the examination for promotion to sergeant in November 1979.

Briscoe's argument that he is qualified for the position of sergeant at the LRPD because of his position in the Navy was not supported by any substantial evidence at trial. Further, Jessie Briscoe admitted that he did not have to write detailed reports in the Navy.

Although no one disputed Briscoe's diligent efforts to do a good job as a police officer (and the Court commends him for this), much evidence was introduced about Jessie Briscoe's inability to write satisfactory reports as indicated by Lieutenant Paul Plummer's testimony. He was Briscoe's supervisor from 1979 to 1980.

Sergeant Carroll Harrison, who supervised Briscoe in Organized Crime and Intelligence, testified that Briscoe gave "a hundred percent" in his efforts but agreed with Lieutenant Plummer's evaluation of Briscoe's inability to write reports. It seems that Briscoe lacks communicative skills and the ability to reduce reports to writing effectively. Sandy Reed worked on the same squad with Briscoe in Organized Crime and Intelligence and confirmed that Briscoe had trouble in writing reports.

As Chief Simpson explained, all police officers must be able to write reports. Often reports are made public by the news media or used in legal proceedings and they must meet appropriate standards. Recently, Briscoe's supervisors asked the Chief to transfer Briscoe out of Intelligence. At that time Briscoe was enrolled in an English course sponsored by the LRPD, for which the Department had paid his tuition. The request for transfer was denied because it appeared that Briscoe was trying to correct his problems. Later, however, Briscoe voluntarily dropped out of the course. The Chief subsequently transferred Jessie Briscoe out of that division. (T. 488–89) The Court would encourage Briscoe to resume his studies so that he will reach his full potential as a police officer.

Briscoe's allegation that he had discriminatorily been required to wash his patrol car was not based upon a correct perception of the situation. Other officers, whites as well as blacks, are required to wash cars when necessary.

Briscoe has not been subjected to disparate treatment or denied promotions because of his race.

### Julius Bryant

Julius Bryant was hired by the LRPD on September 15, 1975. He was transferred from Patrol Division to Community Relations and Training in July 1977, and from Community Relations to Investigation and Apprehension on June 5, 1978. Bryant passed the examination given for promotion to sergeant in November 1979. This was the only time that Bryant took the test. Bryant, a cadet, was not required to wait from March 1975 until October 1975 to be sworn as an officer because of his race. The police chief at that time did not have the option of promoting cadets directly into the Department, as the current chief does. Cadets had to compete with all of the other applicants, be certified, and wait for a vacancy.

The defendants successfully rebutted Julius Bryant's *prima facie* case of disparate impact in having been told to write a letter of apology to a citizen by showing that the offense (forgetting to notify an owner of the recovery of his car) is reasonably serious and merited the discipline imposed. Bryant failed to prove that the proffered explanation was, in fact, a pretext.

Bryant is an intelligent and capable officer but has had some problems with his work. The testimony shows that he does not apply himself fully, and in the past has had a habit of being away from the office and difficult to reach for extended periods of time.

Bryant has not been denied promotions because of his race. By the time of trial of this action, he had only taken the examination once, and had been a police officer for a little over 6 years, which is less than the average time that it takes to be promoted to sergeant. Many white officers with more service time have not been promoted.

### Johnnie Gilbert

Johnnie Gilbert was hired by the LRPD on April 17, 1967. He was transferred from Records and Support to Patrol Division in January 1971; to Records and Support in April 1972; to Investigation and Apprehension in August 1974; and to Records and Support in March 1975. He resigned from the Police Department due to physical disability in November 1980.

Gilbert took the sergeant's examination in March 1975 and failed. He did not take any promotional examinations in 1976 or 1977. Gilbert passed the sergeant's examination which was given in July 1978 and was ranked fifteenth on the eligibility list. Gilbert again passed the examination given for promotion to sergeant in November 1979 and was ranked eleventh on the eligibility list.

Plaintiffs failed to prove that the failure to promote Gilbert to the rank of sergeant prior to expiration of the 1974 eligibility list on April 25, 1975, was attributable to Gilbert's race. (T. 1481) Gilbert's only evidence on this subject was that he had heard "rumors" around the Department that former Chief Weeks had asked Sergeant Larry Dill to revoke his resignation until after the list expired. Dill's resignation was submitted on May 12 or 13, 1975. The resignation was effective on May 23, 1975, which was nearly a month after the list on which Johnnie Gilbert had risen to the top position had expired.

Johnnie Gilbert had difficulty in writing reports and failed to prove that he was as qualified as whites who have received promotions to the rank of sergeant.

Johnnie Gilbert was not denied promotions because of his race. His disability has continued and he is not a candidate for employment or promotion with LRPD.

### Maxie Alexander

Maxie Alexander was hired into the Patrol Division of the LRPD on April 28, 1974.

He was transferred from Patrol to Investigation and Apprehension in September 1980.

Alexander passed the examinations for promotion to sergeant in July 1978 and November 1979.

Alexander has a bachelor's degree in social science. He feels that he has been discriminated against because he has not been promoted even though he has a college degree. A college degree is not part of the selection requirements for promotion to sergeant. If it were, it would probably be attacked in this lawsuit as not job related. In fact, there are white officers with college degrees who have not been promoted. Two examples are James Aulwes, who has a bachelor's degree in criminal justice and 18 hours toward his master's degree; and Albert Miller, who has a bachelor's degree and has never even been on an eligibility list. Plaintiffs have not proved that blacks with college degrees are treated differently from whites with degrees, nor have they proved that college degrees are indicative of one's qualifications for promotion.

Alexander complains because he was not granted his request to transfer but he has not proved his request to transfer to the airport was denied for racially discriminatory reasons. He introduced no evidence to support a finding of impermissible motive for the denial of the transfer. In fact, blacks are not prevented from working at the airport. Andrew Lockhart, black, has worked at the airport and continues to do so. Chief Simpson testified that transfers are often requested, especially to jobs such as in the Detective Division. The person making the request is evaluated for his suitability to the requirements of the requested job. Actually, race has been a positive factor in the granting of transfers in that Chief Simpson has tried to assign blacks to all divisions.

Alexander was named Officer of the Month in 1979 and has received a substantial amount of special and in-service training while employed at the LRPD.

The proof reflects that Alexander has not studied for the sergeant promotional examinations as hard as he could have.

Alexander has not been denied promotions because of his race. Some white officers with more seniority have not been promoted.

### Andrew Lockhart

Andrew Lockhart was hired by the LRPD on November 5, 1969. He passed the examination for promotion to sergeant given in March 1975. He failed the one which was given in March 1976. He passed the examinations for promotion to sergeant which were given in July 1978 and in November 1979.

Andrew Lockhart is presently assigned to the Little Rock Airport.

Any discipline which Lockhart received for his accident in the patrol car in May 1973 is outside the relevant time frame. Andrew Lockhart's assertion that he has not been assigned to a patrol car since then does not necessitate a finding of intentional racial discrimination. This discipline was imposed because of Lockhart's actions, not because of his race. In fact, the evidence disclosed that he had an accident in a police vehicle at the airport in 1981. It is also noted that Andrew Lockhart has enjoyed what was considered by another plaintiff (Maxie Alexander) to be a desirable position at the airport.

The LRPD does not, as a practice, refuse to allow blacks who have had accidents to drive patrol cars. Jack Matlock and Marcella Wilson are among the number of blacks who have been allowed to drive police cars after accidents. Each case is decided on the basis of the facts involved.

Lockhart has not been promoted, but he did not testify concerning his job performance nor about any unfair promotional practices. Therefore, he has not properly raised any allegations of discrimination affecting him personally and has not proved a *prima facie* case.

### Conclusion

Some plaintiffs did not prove they were qualified for promotions. The remaining

plaintiffs did make *prima facie* cases of disparate treatment in promotion; however, defendants successfully rebutted plaintiffs' *prima facie* cases by showing that the promotional process at the LRPD is established by Arkansas law and the CSC regulations, that the criteria set out therein is job related, and that it is fairly and evenly applied to blacks as well as whites. The plaintiffs who did establish *prima facie* cases failed to meet the next requirement: that they show the legitimate business reason for the LRPD promotional process is in fact a *pretext* which is used to discriminate against blacks. As the court stated in *Burdine, supra,* "We do not find that there is any substantial proof in this record that the company's personnel action was a pretext for racial discrimination." *See Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 1093, 67 L.Ed.2d 207 (1981); and *O'Neal v. Riceland Foods,* 684 F.2d 577 (8th Cir. 1982).

The Court also finds as indicated in the foregoing analyses of the evidence and the law that plaintiffs are not entitled to recover under any of the other theories advanced in the pleadings.

Defendants have filed a motion to strike the testimony of certain witnesses because of plaintiffs' failure to comply with the Court's discovery orders. Coupled with this motion is defendants' request to be reimbursed for attorneys' fees and additional expenses occasioned by plaintiffs' delay in making witnesses available for depositions and not furnishing discovery material as directed by the Court. The defendants have made very persuasive arguments on these issues. However, the Court finds that the delay was not caused by the action of the parties-plaintiff and they should not be penalized by striking any of the testimony presented in their behalf nor should costs be assessed against them in the way of sanctions. The Court finds that they acted in good faith at all times.

The Court further finds that the failure of plaintiffs' attorneys to comply fully with the Court's discovery orders was caused either by lack of communication with opposing counsel or negligence and not by willful refusal, so no sanctions will be imposed against them.

Ordinary costs will be assessed in accordance with Rule 54(d) of the Federal Rules of Civil Procedure.

In the recent United States Supreme Court case of *Ford Motor Company v. Equal Employment Opportunity Commission,* —— U.S. ——, 102 S.Ct. 3057, 73 L.Ed.2d 721 (1982), speaking for the majority of the Court, Justice O'Connor stated that:

"The 'primary objective' of Title VII is to bring employment discrimination to an end, *Albemarle Paper, [v. Moody] supra,* [422 U.S. 405] at 417, [95 S.Ct. 2362, 2371, 45 L.Ed.2d 280] by 'achiev[ing] equality of employment opportunities and remov[ing] barriers that have operated in the past to favor an identifiable group . . . over other employees.' *Ibid.* (quoting *Griggs v. Duke Power Co.,* 401 U.S. 424, 429–430 [91 S.Ct. 849, 852–53, 28 L.Ed.2d 158] (1971)). See also *McDonnel Douglas Corp. v. Green,* 411 U.S. 792, 800 [93 S.Ct. 1817, 1823, 36 L.Ed.2d 668] (1973). '[T]he preferred means for achieving' this goal is through '[c]ooperation and voluntary compliance.' *Alexander v. Gardner-Denver Co.,* 415 U.S. 36, 44 [94 S.Ct. 1011, 1017, 39 L.Ed.2d 147] (1974)."

The Court finds that the LRPD under Chief Simpson's leadership has achieved good progress through cooperation and voluntary compliance toward the ultimate goal of equal employment and promotional opportunities for all individuals. The Court finds that the system has no intentional discrimination nor any disparate impact against any of the plaintiffs.

Therefore, it would serve no useful purpose and would be inappropriate for this Court to order any changes in practices or procedures of the LRPD.

For all of the foregoing reasons, the complaints of plaintiffs and intervenors are dismissed with prejudice and judgment entered for the defendants.

IT IS SO ORDERED.